UNITED STATES of America, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, et al., Defendants.

Civ. A. No. 82–0192.

United States District Court, District of Columbia.

Dec. 3, 1987.

Barry Grossman, Chief, Nancy C. Garrison, Asst. Chief, U.S. Dept. of Justice, Antitrust Div., Washington, D.C., for plaintiff.

John D. Zeglis, Jim G. Kilpatric, Francine J. Berry, Mark C. Rosenblum, Basking Ridge, N.J., Howard J. Trienens, David W. Carpenter, Chicago, Ill., Ben W. Heineman, Jr., Robert D. McLean, Sidley & Austin, Washington, D.C., for AT & T.

Thomas P. Hester, Lawrence E. Strickling, John Thorne, Ameritech, Jeffrey J. Kennedy, Michael S. Walsh, Kirkland & Ellis, Chicago, Ill., Alfred Winchell Whittaker, Kirkland & Ellis, Washington, D.C., for Ameritech.

John M. Goodman, Michael J. Shortley, III, Robert A. Levetown, Washington, D.C., for Bell Atlantic.

Norman C. Frost, Mark D. Hallenbeck, Atlanta, Ga., Abbott B. Lipsky, Jr., King & Spalding, Washington, D.C., for Bellsouth.

Herbert E. Marks, James L. Casserly, Diane J. Cornell, Squire, Sanders & Dempsey, Washington, D.C., for Independent Data Communications Mfrs. Ass'n, Inc. (IDCMA).

Albert H. Kramer, Robert F. Aldrich, Wood, Lucksinger & Epstein, Washington, D.C., for North American Telecommunications Ass'n (NATA).

Raymond F. Burke, Gerald E. Murray, Mary McDermott, White Plains, N.Y., for Nynex.

Robert V.R. Dalenberg, San Francisco, Cal., Stanley J. Moore, Washington, D.C., for Pacific Telesis Group.

Edgar Mayfield, James S. Golden, Gregory J. Christoffel, St. Louis, Mo., Liam S. Coonan, Washington, D.C., for Southwestern Bell Corp.

Sue D. Blumenfeld, John L. McGrew, Willkie, Farr & Gallagher, Washington, D.C., for U.S. Telecommunications Suppliers Ass'n.

Joel B. Kleinman, James vanR. Springer, Dickstein, Shapiro & Morin, Washington, D.C., for US West, Inc.

## OPINION

HAROLD H. GREENE, District Judge.

Pending before the Court are (1) questions regarding the meaning of the term "manufacture" in section II(D)(2) of the decree, and (2) issues relating to enforcement of the decree.

### I

#### Background

In April of 1985,[1] AT & T [2] filed with the Department of Justice requests for enforcement of the decree's prohibition on Regional Company manufacturing of telecommunications equipment and customer premises equipment.[3] For more than two years, the Department did not respond to

---

1. The first AT & T request was filed April 29, 1985.

2. Others which filed such requests in April 1985 or thereafter include North American Telecommunications Association (NATA), Independent Data Communications Manufacturing Associa-

tion (IDCMA), and United States Telecommunications Suppliers Association (USTSA).

3. Section II(D)(2) of the decree provides that no Regional Company may "manufacture or provide telecommunications products or customer

the requests; it did not take enforcement action; and it did not inform the Court that the requests had been made. *See infra.* Earlier this year, the Court was advised by a number of different parties that the Department had failed to take steps to remedy various alleged violations of the decree, including violations of the restriction on manufacturing.[4] The Court thereupon issued an order, on May 18, 1987, requesting the Department to respond to these complaints, and the Department's Response thereafter for the first time brought its position on the manufacturing controversy to the attention of the Court.[5]

On June 19, 1987, following the May 27 revelations, AT & T filed with the Court a motion for a declaratory ruling regarding the meaning of the term "manufacture" in section II(D)(2) of the decree, advising it of the Department's inaction.[6] The Department responded on August 21, 1987[7] and, at or about the same time, most of the Regional Companies submitted their own memoranda with the Court.[8] On September 10, 1987, AT & T filed a reply to the various responses and oppositions to its motion. The Court is thus now called upon to rule on the meaning of the term "manu-

premises equipment," and section VIII(A), an amendment suggested by the Court, mandates that notwithstanding the prohibition in section II(D)(2), the Regional Companies may "provide, but not manufacture" customer premises equipment.

4. Among claimed violations of section II(D)(2) are the following. On April 29, 1985, AT & T advised the Department that BellSouth and Siecor, a manufacturer of telecommunications equipment, were participating in a joint venture allegedly in violation of the manufacturing restriction of the decree. On January 14, 1986, NATA wrote to the Department that a US West subsidiary had designed and developed with American Pay Phone Systems a coin phone retrofit kit, and on May 7, 1986, NATA supplied to the Department detailed legal and factual support for its contention that this venture constituted a violation of section II(D)(2) of the decree. On October 20, 1986, the Department was advised by USTSA that Ameritech planned to license technology allegedly for the production of telecommunications equipment and CPE. IDCMA informed the Department on December 1, 1986 that Pacific Bell had designed and developed electronic devices for multiple use of copper wires and had sought to reserve to itself a monopoly on the practical application of such devices (which need to be connected to the local company's central office to function) by allegedly refusing to provide functional specification to any competing supplier. This last claim, if true, would parallel some of the Bell System anticompetitive pre-divestiture activities, and it would represent a classic example of the need for the section II(D)(2) restriction. Compare the US West claim (Memorandum at 7–9) that a Regional Company that designs and develops equipment would have no incentive to withhold network information from competing firms.

5. The May 27 Response basically provided a history of the complaints regarding violations of the manufacturing restriction the Department had received and its actions in response thereto; the alleged difficulty of the definitial problems;

and the reasons for the Department's decision not to undertake enforcement actions in view of the fact that certain reports were to be filed in 1987. *See* page 5, *infra.*

As discussed in more detail below, the Department also took the position that it would not be enforcing section II(D)(2) unless a Regional Company was actually "fabricating" equipment (the Department concluded that none was) or unless the Department concluded on its own, irrespective of the decree prohibition, that particular Regional Company design activities presented substantial competitive risks (it found that none did). May 27 Response at 40–44. Some of the substance of the material in the May 27 filing is repeated in the Department's August 21, 1987 Response which is discussed in some detail below.

6. The trade associations representing the large and small manufacturers (note 2, *supra*) have each filed several memoranda supporting the AT & T position.

7. The August 21, 1987 document will hereinafter be referred to as the Department Response.

8. Opposition of Ameritech to AT & T's Motion for Declaratory Ruling on the Meaning of Manufacturing (July 10, 1987); Bell Atlantic's Opposition to AT & T's Motion for a Declaratory Ruling on the Meaning of Manufacturing (July 10, 1987); BellSouth Corporation Memorandum in Opposition to AT & T Motion for Declaratory Ruling (June 30, 1987); Opposition of NYNEX Corporation to AT & T's Motion for a Declaratory Ruling on the Meaning of Manufacturing (July 10, 1987); Memorandum of US West, Inc. in Opposition to AT & T's Motion for Declaratory Ruling on the Meaning of Manufacturing (July 10, 1987); Response of Southwestern Bell Corp. to AT & T Motion for Declaratory Relief on the Meaning of Manufacturing (July 10, 1987); Answer of Pacific Telesis Group to Motion of AT & T for Declaratory Relief on the Meaning of Manufacturing (June 30, 1987).

facture" in section II(D)(2) of the decree.[9]

## II

### Failure of Department of Justice to Act

#### A. Past Practice

■ Before proceeding to a consideration of the substantive issues raised by the AT & T motion, it is appropriate, in response to AT & T's vigorous complaints and those of others (*e.g.*, IDCMA and NATA), to consider the failure of the Department of Justice to take enforcement action for well over two years after receipt of requests therefor. During that period, the Department came to accept the view that the definition of the term "manufacture" presents a difficult issue, and that the best course of action therefore was to halt enforcement until the Department's triennial report was due in court in the spring of 1987, and, in connection therewith, a report by the Department's consultant, Dr. Peter Huber. At that time, according to the Department, it might be appropriate for the Court to repeal the manufacturing restriction [10] and the problem would thus be mooted.[11] There are several faulty assumptions underlying that line of reasoning.

First, as discussed *infra*, the question as to the meaning of the term "manufacture" is not as difficult as the Department believes it to be. Rather, it represents a fairly straightforward legal issue subject to resolution by reference in the usual way to the language of the decree and the purposes underlying it.

Second, even if the issue were difficult, that would not constitute an adequate justification for a decision not to resolve it or to fail to enforce the underlying decree provision. Few issues that arise in litigation have only a single obvious, non-controversial answer, whether it be in suits at common law or in the enforcement of statutes or court judgments. If the difficulty of the issues were grounds for avoiding action, let alone for repealing the problematic text, the enforcement of the law, civil or criminal, statutory or embodied in judgments, would shrink drastically.[12] Much of the Internal Revenue Code, for one, might not be enforced at all.

Third, at a minimum, the alleged difficulty of the questions is not grounds for a failure to notify those requesting enforcement, the court which had entered the decree, or both, that no action was being taken, thus denying them the opportunity

**9.** *See* section VII of the decree ("any of the parties ... [may] apply to this Court at any time ... for the construction [of the decree]").

**10.** On September 10, 1987, the Court issued a comprehensive Opinion, which *inter alia* denied the request for the removal of the manufacturing restriction.

It is perhaps worthy of note that, as the Court has now learned, the President's Council of Economic Advisers has apparently also opposed removal of the manufacturing restriction, believing that the only way to deal with rate regulated monopolists and their relationship to competitive industries is to restrict them strictly to the provision of the regulated monopoly service. Senate Judiciary Committee hearings, *infra*, at 66.

**11.** In its May 27, 1987 Response, the Department states that its decision not to take enforcement action pending the report of Dr. Huber did not reflect its belief that the report might modify the decree restrictions but only that the report might have provided support for an argument that a definition of manufacturing that included design engineering would best serve

the decree's purposes. Response at 42–43. To the extent that the distinction that is being drawn in that argument is one with a difference, it does not support a failure to proceed, for it represents the faulty conclusion that an enforcement hiatus of several years is justifiable on the basis that the conclusions of a Justice Department consultant, however gifted, might, at the end of that period, prove decisive to the resolution of a legal issue.

**12.** The Department of Justice does not appear to have taken such a stand in other contexts. It does not appear that, for example, the Solicitor General has advised the Supreme Court that the Department would not enforce and instead would simply ignore a particular law enacted by the Congress, an administrative regulation, or a judgment of a court, because they were too complicated, the concepts were too blurred, or the complete outline of the issues could not readily be discerned. It may confidently be predicted that such an argument, were it to be made, would not be well received.

to make their own judgments as to the next step, if any.[13]

Fourth, there was no valid basis in 1985 for tying the decisionmaking process to the 1987 triennial review of the decree. If such a relationship were to be considered appropriate, enforcement of the decree, at least with respect to the more "difficult" issues, would proceed only in one year out of every three, the remaining two years being reserved for contemplation of the probable effects of the next triennial review.[14] In short, the complaints regarding the Department's failure to act are well taken.[15]

## B. Expectations for the Future

These problems would, however, appear to be a thing of the past. The Department of Justice has now repeatedly announced that it is firmly committed to the enforcement of the decree in this case.[16]

---

**13.** In partial justification of its failure to act, the Department in its papers (Department Response at 42 n. 66) and Assistant Attorney General Rule in his testimony (Senate Judiciary Committee Hearings of May 28, 1987 at 65) suggest that AT & T had the right at any time to seek enforcement on its own. But the Department was completely silent during the two-year hiatus—a silence that in response to AT & T's request for an investigation could have had many different explanations: the investigation was ongoing, steps were being taken to remedy the problem, Department personnel were simply too busy, and the like. AT & T could hardly know that the Department was failing to take action on the basis of the unusual line of reasoning now revealed. In light of the Court's oft-expressed view that enforcement issues should be taken to, and preferably resolved by, the Department of Justice in lieu of or in advance of any resort to the Court (*see, e.g.,* Opinion of March 15, 1984; Opinion of September 14, 1984), AT & T could have been subject to legitimate criticism, akin to a claim of failure to exhaust administrative remedies, had it petitioned the Court while the subject was presumably being actively addressed by the Department.

**14.** It might also be noted that, when the Department decided in 1985 and 1986 to await the next triennial review, it presumably did not know what its own recommendation to the Court would be with regard to the manufacturing restriction, since its position on the issues surrounding the decree restrictions was dependent upon the results of the Huber study—a study that was not completed or filed until February 2, 1987. Moreover, even if the Department did know prior to the receipt of the Huber Report that some of Dr. Huber's conclusions would arguably support the removal of the manufacturing restriction, it could not know whether the Court would agree with any such recommendation. As it ultimately turned out, the Court did not agree, and the manufacturing restriction is still very much a part of the decree. Thus, nothing positive was gained as a consequence of the delay, and those parties and intervenors which were entitled to rely on that decree and its execution may have been unnecessarily injured.

**15.** In its Response of May 27, 1987, the Department states that its actions should "reassure the Court that the Department clearly perceives the distinction between its obligation to enforce the decree and its obligation to make recommendations on the basis of competitive policy considerations under the waiver and triennial report procedures." Response at 44. The Court is not completely reassured (but *see* Subpart B, *infra* ), if only because some of the Department's actions ignore that distinction.

For example, the Department states that it was awaiting the arrival of the Huber Report before engaging in enforcement to see whether that report would find that Regional Company ownership of local exchange networks gave them substantial ability to design those networks so as to disadvantage rival CPE manufacturers. Department Response at 42. Yet, the Court had made findings on that very subject in approving the decree (*United States v. AT & T,* 552 F.Supp. 131, 190–91 (D.D.C.1982))—findings that had not been removed or modified by waiver, triennial review, or otherwise. *See also* note 5, *supra,* which indicates that, rather than to enforce the decree as it stands, the Department assumed that it had the authority in effect to amend the decree by reading out of it significant provisions prohibiting activities which, in the Department's opinion, do not present substantial competitive risks.

The decision on what constitutes such a risk was made when the decree was signed by the representatives of the United States and of AT & T as well as by the Court, and entered as a judicial judgment on August 24, 1982. That decree includes a prohibition on Regional Company manufacturing and as such it is binding unless and until removed or modified as a result of waiver, triennial review, or application of section VIII(C) of the decree. Contrary to its claims on May 27, the Department did not await waiver or triennial review proceedings and the Court's decisions in connection therewith, but made its own decision on the competitive situation outside the framework established by the decree.

**16.** That is, in any event, its obligation. *See* 15 U.S.C. § 16(b)–(h) (Tunney Act), which prescribes that the Department of Justice may not

Thus, the Department stated in a document submitted to this Court in May of this year that it

... completely agrees with the Court as to the nature of our enforcement responsibilities. It would be improper for the Department not to investigate alleged decree violations or to fail to take enforcement action against violations of any provision of the decree solely because we thought that particular restrictions were no longer necessary. As long as the decree's current restrictions remain in effect, we recognize that it is the Department's responsibility to enforce them in good faith under traditional prosecutorial standards. It has been and will continue to be our policy to do so. The Department has made numerous public statements to that effect in the past, and we reiterate the policy today.[17]

Similarly, when Assistant Attorney General Charles F. Rule was testifying before the Senate Committee on the Judiciary in support of his confirmation, he assured the Committee

... that we take our obligation very seriously. We have told the staff, and I think the staff takes their obligation very seriously, to enforce the decree. If a decree restriction is involved, then we will take appropriate action ... Whether or not I think a particular restriction in a decree is a good idea or a bad idea is irrelevant to my obligation to enforce the decree. I recognize that....[18]

Unfortunately, not all officers of government are behaving with a like sense of responsibility. The Chairman of the Federal Communications Commission recently took the unusual, if not unprecedented, step for the head of a regulatory agency, of exhorting those whom the agency regulates to refuse to comply with orders duly issued by this Court, stating that he was "quite frankly, surprised by the apparent acquiescence of some of the Bell Operating Companies in the ongoing administration of the [decree in this case]." Address of Hon. Dennis R. Patrick, October 13, 1987. The only acquiescence that occurs between the Court and the Regional Companies is that the companies carry out the Court's judgments and orders directed to them, as they must under law. An incitement to noncompliance, if successful, could thus have serious consequences.

In the same address, the FCC Chairman also questioned the legitimacy of the Court's jurisdiction, presumably again for the benefit of those whom the Commission regulates, characterizing as a willingness "to supplant the role of Congress" the Court's enforcement of the decree in this case. That decree (1) was entered pursuant to a landmark Act of Congress [19] (Sherman Act, 15 U.S.C. §§ 1–3); [20] (2) it is the product of a lawsuit brought by one Attorney General of the United States and it was settled, largely upon the terms of the decree presently being enforced, by the authority of a successor Attorney General; [21]

abandon an antitrust action through settlement without judicial approval. What the Department cannot do directly, by entry into a non-approved consent decree, it presumably is also precluded from doing indirectly, by non-enforcement of an approved consent decree. *See* in this connection also sections V and VI of the decree which explicitly contemplate decree enforcement by the Department of Justice. The Department's obligation here is thus even broader and more direct than its normal obligation under Article II of the Constitution, as agent of the President, to see that the laws be faithfully executed. *See* 28 U.S.C. § 501 *et seq.*, Executive Order 12301, section 2(d), 46 Fed.Reg. 19211.

17. Response of May 27, 1987 at 2.

18. Hearings of the Senate Committee on the Judiciary of the U.S. Senate on the nomination

of Charles F. Rule for the position of Assistant Attorney General, May 28, 1987, at 55–56.

19. Because it establishes rules of fair competition for all business enterprises, large and small, the statute is a cornerstone of American public policy, and it has justly been described as a counterpart in the economic arena to the Bill of Rights in the political realm.

20. Legislative efforts, both before and after entry of the decree, to exempt telecommunications, directly or indirectly, from the application of the antitrust laws have not been successful.

21. Information adduced during the AT & T trial indicated that President Reagan rejected requests from the Departments of Commerce and Defense to instruct the Department of Justice to abort the lawsuit.

and (3) it has been explicitly sustained by the Supreme Court of the United States.[22] In short, the decree here is one of the few judicial judgments to bear the stamp of authority of all three branches of government. Not to enforce it would be irresponsible.

Whatever private parties may properly argue in the heat of advocacy, such thoughtless statements by a high official of government are unfortunate. Notwithstanding these appeals for noncompliance, however, this Court will continue, as it has done in the past, to make every effort to avoid or minimize interference with FCC jurisdiction and operations where this can be done without jeopardizing the core provisions of the decree.[23] *See, e.g.,* Memorandum and Order of December 14, 1984, which deferred dissolution of contracts between AT & T and its Operating Companies for over a year, notwithstanding the requirements of section B(1) of Appendix B of the decree, in order to afford the FCC additional time within which to approve tariffs to replace these contracts.

However, there should also be no doubt that this Court will carry out its constitutional and statutory responsibility to protect and enforce the decree in this case, as in other cases, against violation, obstruction, or interference by anyone, public or private, as federal judges have done throughout history.[24] In that context particularly, the Court is heartened by the statement of Assistant Attorney General Rule and the policy expressed in the Department's May 27 Response. These reaffirmations, together with the Court's views expressed herein on the need for leaving no doubt about enforcement, should go a long way toward clearing up any misunderstandings with regard to the protection of a decree that, after all, is largely the product of evidence adduced by the Department of Justice in a trial conducted by this Court.

### III

### *Manufacture Includes Both Fabrication and Product Design and Development*

The basic substantive issue before the Court on AT & T's motion is whether the manufacturing restriction prohibits only the fabrication of equipment or also the design and development prior to and in conjunction with fabrication. The Regional Companies contend that only fabrication is prohibited by the decree.[25] Initially this

---

**22.** *Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983), *affirming United States v. AT & T,* 552 F.Supp. 131 (D.D.C. 1982).

**23.** Until the recent past, the FCC had likewise generally sought to avoid conflict. It may be hoped that this policy will again be followed in the future, as other entities with possible jurisdictional overlap (*e.g.,* Treasury Department and Federal Reserve Board; congressional legislative committees and appropriations committees; federal courts and state courts; General Accounting Office and the inspectors general and contracting officers of the various agencies; State Department and Immigration and Naturalization Service) normally seek to avoid rather than to create friction.

**24.** Even relatively recent history reveals examples of such stands in far more dramatic and trying circumstances than are involved here: Judge Frank Johnson's resistance against the attempted nullification of the court process by Governor Wallace of Alabama; Judge Skelly Wright's defense of his decrees against repeated efforts of the Louisiana legislature to thwart the desegregation of the New Orleans schools; Judge John Sirica's refusal to be swayed even by

the weight of the Presidency; and the steadfastness of appellate judges John Minor Wisdom, John R. Brown, Elbert P. Tuttle, and Richard T. Rives in the face of sustained resistance by the State of Mississippi against the admission of James Meredith to that state's university—to name but a few of the better known instances.

In these and other situations, efforts were made to interpose state laws, executive commands, or administrative regulations between federal court decrees and those required to carry them out. However, the federal courts, in all but one of these situations with the unwavering support of federal executive authorities, in particular the Department of Justice, saw to it that the decrees were not violated or circumvented.

**25.** Opposition of Ameritech to AT & T's Motion for Declaratory Ruling on the Meaning of Manufacturing at 2–5 (July 10, 1987); Bell Atlantic's Opposition to AT & T's Motion for a Declaratory Ruling on the Meaning of Manufacturing at 4 (July 10, 1987); BellSouth Corporation Memorandum in Opposition to AT & T Motion for Declaratory Ruling at 2 (June 30, 1987); Opposition of NYNEX Corporation to AT & T's Motion for a Declaratory Ruling on the Meaning of

was also the view of the Department of Justice as it was expressed in its Response of May 27, 1987 [26] and in testimony of then Acting Assistant Attorney General Rule before the Senate Committee on the Judiciary.[27]

■ There is no valid basis for the position that only fabrication is prohibited by section II(D)(2). The term "manufacturing" has different meaning and breadth in different circumstances. For example, according to leading business textbooks, it includes both the physical act of fabricating and the design of the product being made.[28] On the other hand, there are some general purpose dictionaries, cited by the Regional Companies, that define the term only as making a product suitable for use by labor or machinery,[29] and, depending upon the context and the purpose of the law, there are statutes that provide similar definitions.[30] Some ambiguity may thus be said to inhere in the term itself, but that ambiguity is completely resolved when resort is had to the contemporaneous intent of the parties to the consent decree: [31] there cannot be the slightest doubt that the parties intended by section II(D)(2) to bar the Regional Companies from the entire manufacturing process, including design, development, and fabrication.

The decree was aimed at preventing in the future the anticompetitive practices in which the Bell System was assumed to have been engaged in the past.[32] Yet the Bell Systems' practices in the design and development of equipment were responsible for the section II(D)(2) restriction as much as, if not more than, its practices

Manufacturing at 2 (June 30, 1987); Answer of Pacific Telesis Group to Motion of AT & T for Declaratory Ruling on the Meaning of Manufacturing at 3 (June 30, 1987); Southwestern Bell Corporation's Response to AT & T's Motion for Declaratory Ruling on the Meaning of Manufacturing at 2 (July 10, 1987); Memorandum for US West, Inc. in Opposition to AT & T's Motion for Declaratory Ruling on the Meaning of Manufacturing at 2 (July 10, 1987).

26. Response of May 27, 1987 at 31. In some respects, that Response is ambiguous; but it is the dominant thrust of that document that only activities involving fabrication constitute clear violations of the manufacturing restriction.

27. Testimony of Assistant Attorney General Charles F. Rule of May 28, 1987 at 63 ("we did not have a historical record that manufacturing went further than fabrication").

28. *See* I. Abramowitz, *Production Management* at 8–9, 76 (1967); K. Biegel, *Production Control* at 8, 14 (1971); F. Moore, *Manufacturing Management* at 8 (1969).

29. *E.g.,* Random House Dictionary; Oxford American Dictionary. However, Webster's International Dictionary and Webster's New Collegiate Dictionary, define "manufacture" as "to make into a product suitable for use" or to "produce according to an organized plan," a definition that includes design and development.

30. *E.g.,* National Cooperative Research Act of 1984, 15 U.S.C. § 4301 *et seq.*; Comprehensive Drug Abuse Prevention and Control Act, 21 U.S.C. § 802, also cited by some of the Regional

Companies. These statutes are not only alien to the subject matter at hand, but even the definitions on which the Regional Companies rely are not especially apposite. Thus, the Act of 1984 applies and was intended to apply only to cooperative research; it therefore quite naturally concentrates on research, and it thus sheds no particular light on the scope of "manufacturing" in a different context. Section 802(14) of the Comprehensive Drug Abuse Prevention and Control Act, which deals with drug abuse, defines the manufacturing of heroin and other controlled substances as including the processing of the drug; it excludes the preparation, compounding, packaging, and labeling. This law enforcement statute, designed to deal with street crime and unlawful dispensation and distribution of narcotics, does not cover research into drugs or their side effects or the development of such drugs by scientists. It would be strange if it did.

31. *United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975); *White v. Roughton,* 689 F.2d 118, 119–20 (7th Cir.1982); *United States v. Western Electric Co., Inc.,* 797 F.2d 1082, 1089 (D.C.Cir. 1986); *United States v. Western Electric Co.,* 592 F.Supp. 846, 855–57 (D.D.C.1984), *appeal dismissed,* 777 F.2d 23 (D.C.Cir.1985).

32. As the Court said in the Opinion approving and explaining the decree, "This standard requires that the Operating Companies be prohibited from … manufacturing equipment used in the telecommunications industry. Participation in these fields carries with it a substantial risk that the Operating Companies will use the same anticompetitive techniques used by AT & T in order to thwart the growth of their own compet-

with regard to fabrication. In fact, in virtually every "manufacturing episode" that was the subject of a pretrial charge by the government or that produced evidence at the trial, it was design and development manipulation that was the focus or the sole subject rather than discrimination with respect to fabrication.[33] *See United States v. AT & T*, 524 F.Supp. 1336 (D.D.C.1981), which discusses the "manufacturing" or "procurement" evidence adduced by the government at the trial.[34] To the same effect, *see*, Department of Justice Memorandum of August 16, 1981 at 366–387, 391–410;[35] Department of Justice Report filed February 2, 1987;[36] Response of the United States to Waiver Motion of Bell-South, March 26, 1984;[37] Department of Justice Competitive Impact Statement at 15; and AT & T's Response to Objections to Plan of Reorganization at 524, 535.

In short, the evidence underlying the decree strongly suggests that the Bell System used its local monopoly position to disadvantage and to drive out of business competing manufacturers of equipment primarily through discrimination and cross-subsidization at the design and development stages. Unless it be assumed, contrary to all reason and logic, that the parties intended to aim the "manufacturing" restriction at something different or far

itors." *AT & T*, 552 F.Supp. at 224. *See also* Department Response at 12.

**33.** That is not surprising. Most of the costs of new telecommunications products are determined by the design and development stages of manufacturing, *see, e.g.,* Report of Dr. Peter Huber at 14.20, and they therefore lend themselves far better to cross-subsidization and discrimination than does the fabrication process. In fact, however, design and fabrication engineers typically work together to ensure that product designs take account of production methods, testing capabilities, quality control, and the like.

**34.** The Court there said (*AT & T*, 524 F.Supp. at 1371–72 (footnotes omitted)):

This evidence tended to show that the general trade manufacturers encountered a considerable number of obstacles in trying to design equipment for, and to sell this equipment to, the Bell Operating Companies, and that these obstacles perpetuated a buy-Western bias. For example, the competitors had difficulty in locating the employee in Western or the Operating Companies authorized to negotiate a sale; in obtaining from Bell compatibility specifications (without which general trade products could not be designed for interconnection with the Bell network); and in persuading Bell Labs to compete objective evaluations (which were usually required before sales could be effected) ... AT & T officials ... were required to provide detailed justifications for general trade purchases which were not necessary for the purchase of Western equipment.

... First, AT & T, in conjunction with Bell Labs and Western Electric, sets the technical standards under which the telephone network operates and the compatibility specifications which equipment must meet. Second, Western Electric and Bell Labs ... serve as counselors to the Operating Companies in their procurement decisions, ostensibly helping them to purchase equipment that meets network standards. Third, Western also produces equipment for sale to the Operating Companies in competition with general trade manufacturers.

The upshot of this "wearing of three hats" is, according to the government's evidence, a rather obviously anticompetitive situation. By setting technical or compatibility standards and by either not communicating these standards to the general trade or changing them in mid-stream, AT & T has the capacity to remove, and has in fact removed, general trade products from serious consideration by the Operating Companies on "network integrity" grounds.

**35.** The Memorandum states that the defendants' anticompetitive practices in manufacturing included "the preannouncement of new product offerings to the Bell operating companies" and abuse of "their monopolies in the markets for local exchange and intercity telecommunications service by withholding and manipulating network specifications and standards needed by general trade suppliers to *design* equipment for the Bell market" (emphasis added).

**36.** The Report states (at 169) that "limiting the term 'manufacturing' to fabrication of a final product would serve little purpose since it is the earlier research and development stages that raise the discrimination and cross-subsidization concerns that gave rise to the [decree] prohibition."

**37.** The Department there stated (at 6 n. *) that "BellSouth ... proposes to design the networks and satellite earth stations itself. This entry into the business of designing telecommunications equipment (even though the fabrication would be subcontracted to another firm) would create incentives for the BOCs to take advantage of their responsibility to establish standards for interconnection to the exchange carriers' networks on a nondiscriminatory basis which was

less comprehensive[38] than what the evidence had revealed by way of anticompetitive conduct, the conclusion is inescapable that the restriction includes product design and development. Indeed, if the Regional Companies are correct,[39] that is, if they could engage in design and development of telecommunications and customer premises equipment, they would have the same incentive and ability to undermine competition and competitors as did the Bell System, and additionally they would now also have the incentive and ability to decimate the newly-emerged thriving, competitive equipment market.[40] *See* Opinion of September 10, 1987 at 79.[41]

Based upon this evidence, the Department has now likewise concluded that the section II(D)(2) restriction has considerably greater scope than mere fabrication, and it accordingly states, with commendable candor, that

> A manufacturing restriction that prohibited fabrication but permitted all design and development would not have assuaged the concerns expressed, at the

time the decree was entered, by the Department and the Court about cross-subsidization, discriminatory purchasing, and interconnection discrimination. The likelihood of cross-subsidization was greater in the design and development area than in fabrication. The risk of cross-subsidization arose primarily from the existence of joint and common costs that made improper allocation of costs between regulated and unregulated activities difficult to detect. And it would have been more difficult to distinguish equipment research, design and development expenses from network research, design and development expenses than to distinguish equipment fabrication expenses from those associated with network activities.

In addition, because it is the designer or developer of that interface that needs information about the network, the concern about discrimination in network changes or in access to information about changes in network standards arose primarily from BOC involvement in

---

the reason the BOCs were prohibited from providing telecommunications equipment."

**38.** The decree prohibitions were not intended merely to forbid isolated acts or conduct (*e.g.,* fabrication) but lines of business (interexchange, information services, manufacturing). United States Response to Public Comments, May 20, 1982, at 43–44.

**39.** Some of the Regional Companies, as at times in the past, tenaciously cling to arguments having no relationship to the subject matter at issue, apparently in the hope that, if they are repeated often enough, someone—this Court or some other body—will end up being persuaded. *See, e.g.,* the Ameritech memorandum which goes to great lengths to attempt to demonstrate that the concerns which led to the adoption of the decree restrictions have now been "substantially attenuated." Ameritech Opposition at 13–18. That issue was briefed, argued, and fully resolved in the Court's Opinion of September 10, 1987. In any event, these arguments do not elucidate the meaning of the term "manufacture" as it was made a part of the decree in 1982—which is the issue before the Court on the present AT & T motion.

Similarly, Bell Atlantic (Opposition at 9–10) and Pacific Telesis (Opposition at 3–4) contend that they could not market equipment unless they also designed and developed it. Thousands of automobile dealers throughout the United States manage quite well to sell cars without

also designing them, and many retail dealers of CPE operate in similar fashion.

**40.** As AT & T correctly points out, it is a cornerstone of the decree that technology will flourish and equipment suppliers multiply if the company that funds research from monopoly local exchange operations is excluded from the design and development of telecommunications equipment and products. With such an injunction, the telephone company must share the funds of its research activities by disseminating "generic" new product specifications from which unaffiliated manufacturers will compete to design and develop innovative new products. AT & T Reply at 5–6. USTSA similarly notes, with ample justification, that adoption of the construction of "manufacture" urged by the Regional Companies would trivialize the decree prohibition. USTSA Memorandum at 3.

**41.** As late, or as early, as last year, the Court reiterated:

> "The Regional Companies are not permitted to manufacture telecommunications equipment because the danger of discriminatory *design* is so substantial, and because neither the Court nor regulatory authorities have any practical ability to recognize and police discrimination in technological *design* until it is too late. The alliance of exchange service and manufacturing was an overwhelming concern of the decree" (emphasis added).

Opinion of February 26, 1986 at 25.

designing or developing the manner in which equipment interconnects with the BOC's network, rather than merely specifying generic or functional requirements. For these reasons, the parties and the Court believed that, under the conditions they anticipated would exist at divestiture, if the BOCs were allowed to perform design functions that included designing or developing interface specifications, they could use and gain an anticompetitive advantage from network information not available to their competitors. Merely requiring the BOCs to use independent fabricators to assemble products based on interface specifications designed and developed by the BOCs would not have removed the potential for discrimination on which the equipment restrictions were based (footnotes omitted).

Department Response at 15–16.

## IV

### *The Restriction on Manufacture is Not Indefinite*

That conclusion alone resolves the Department's asserted dilemma in not knowing whether to enforce the manufacturing restriction because allegedly the term "manufacturing" is "somewhat amorphous" and the intent of the parties with respect to design and development activities is difficult to ascertain.[42] Even if it be assumed, *arguendo*, that there is a substantial basis for the existence of such a difficulty—but, as will be discussed *infra*, there is not—it would not follow that the

restriction found in section II(D)(2) of the decree may be disregarded and left to atrophy through non-enforcement.

Certainly, any attempted fabrication activities of the Regional Companies could be halted through enforcement (since there is no doubt as to the decree's application to them),[43] and so could design and development activities which, by anyone's understanding,[44] including that of the Department of Justice, are properly encompassed within the restriction. If there was lack of complete clarity as to the remainder, that could have been handled, as contested legal matters are handled every day in thousands of courtrooms and administrative or other enforcement offices throughout the nation, by the exercise of individualized judgment. In short, even on the Department's own terms the non-enforcement option it chose during the past several years has no sound basis. Beyond that, as will now be shown, most of the difficulties of interpretation on which the Department relies are non-existent.

### A. Use of the Term "Provide"

The Department states that the "Court's opinions ... suggest that in requiring modification of the decree to allow the BOCs to 'provide' CPE, the Court may have intended to allow them some limited role in the design and development of CPE."[45] There is no basis whatever for that assumption. The Court made crystal clear in the explanation of its recommendation that the decree be modified to permit the Regional Companies to provide CPE that the term "provide" or "providing" was meant to be

---

42. Department Response at 5, 12–13, 18, 27–29, 36–38. What is truly difficult to understand is that the Department finds amorphous and difficult to understand (and therefore to enforce) a term it apparently was responsible for including in the decree. As IDCMA astutely points out (Consolidated Reply at 4 n. 5), "The Department negotiated and signed the consent decree and undoubtedly had rather definite intentions in doing so. For the Department now to profess uncertainty about what those intentions were or claim that it does not know whether the manufacturing provision should be construed to effectuate those intentions borders on the incredible." Actually, it appears that the decree was largely drafted by the Department of Justice.

*See* Coll, *The Deal of the Century*, at 303–19 (1986).

43. The Department contends that none of the complaints it has received actually involved fabrication, but that is not clearly established. In any event, the Department's failure to undertake *any* enforcement activity with respect to claimed violations of the restriction on manufacture could not but encourage ever broader Regional Company departures from the decree standard.

44. Except that of the Regional Companies.

45. Department Response at 4; *see also* Response of May 27, 1987 at 29.

synonymous with marketing or selling (as distinguished from designing or developing).

The Court used the term providing, rather than one of its synonyms, only so as to be consistent with other, existing provisions of the proposed consent decree.[46] In every one of those instances, it is plain from the context that the term "provide" or "provision" was to be synonymous with furnishing, marketing, or selling. Absent evidence to that effect, there is no reason to believe that this Court, when it used the identical term in its proposed amendment of the decree, or the parties when they accepted that amendment, intended it to have an entirely different meaning, *i.e.*, design and development.

Not only is there no such evidence, but all the evidence is to the contrary. The section of the Opinion, which explains the Court's rationale for requesting the amendment to allow the Regional Companies to provide CPE, is headed "Marketing of Customer Premises Equipment." *AT & T*, 552 F.Supp. at 191. The discussion in the text is entirely devoted to issues of marketing CPE in the sense of selling, in contradis-

tinction to manufacturing.[47] There is not a single word in that explanation or in any materials filed by anyone else at the time of the adoption of the amendment (or since), that would lend the slightest support to the proposition that, in addition to permitting post-fabrication selling, the term "provide" was also meant to allow the Regional Companies to engage in pre-fabrication research and development.[48]

### B. Generic versus Product Development

According to the Department, the parties and the Court intended the Regional Companies to have a substantial role in the design and development of telecommunications equipment and the software used in their own networks as well as a more limited role in the design and development of CPE.[49] In support of that conclusion, the Department refers to Regional Company engineering functions, and it relies on the fact that under the AT & T Plan of Reorganization, Bellcore[50] and the Regional Companies were to perform network planning and central office engineering, including

---

**46.** *E.g.,* "no BOC shall ... provide interexchange telecommunications services or information services" (section II(D)(1)); "no BOC shall ... manufacture or provide telecommunications products or customer premises equipment" (section II(D)(2)); "no BOC shall discriminate ... in the provision of new services" (section II(B)(4)); "no BOC shall ... provide any other product or service" (section II(D)(3)). The Department of Justice Competitive Impact Statement stated with respect to the prohibition on the provision of CPE (at 40) that this "would eliminate entirely the ability to cross-subsidize the *sale* of such equipment with revenues from the [Regional Companies'] monopoly exchange telecommunications services."

**47.** *See, e.g.,* 552 F.Supp. at 191–93 ("The proposed decree would also prohibit the Operating Companies from selling or leasing customer premises equipment. While the Department of Justice's comments and briefs tend to blur the distinction between manufacturing and marketing, in fact the restrictions in the two activities present wholly different considerations" (footnote omitted)).

**48.** In a Memorandum dated May 25, 1982, the Court likewise spoke (at 7) of a judgment that would bar the "manufacture and *sale* of telecommunications products and customer premis-

es equipment" (emphasis added), and on August 23, 1982, in discussing the removal of the restriction on the provision of CPE, the Court again referred (at 2–5) to that concept in terms of selling and marketing.

**49.** Department Response at 18 *et seq.* Thus, it is said that section I(A)(1) of the decree required AT & T to transfer to the Regional Companies, presumably for their use "sufficient facilities, personnel, systems, and rights to technical information to permit them to perform ... engineering ... functions." There is a similar reference to engineering in section I(B) of the decree, and the Competitive Impact Statement filed by the Department explained that the Regional Companies were to perform these engineering services as part of their responsibility to perform services that are incidental to exchange services.

**50.** What is now known as Bellcore was referred to in the AT & T Plan of Reorganization as the Central Staff Organization. Bellcore provides a variety of technical services to the Regional Companies. *United States v. Western Electric Co., Inc.,* 569 F.Supp. 1057, 1113–18 (D.D.C. 1983), *aff'd sub nom., California v. United States,* 464 U.S. 1013, 104 S.Ct. 542, 78 L.Ed.2d 719 (1983).

planning capacity, design, layout, procurement, design recommendations for transmission systems, and installation of central office equipment.[51] The Department also points to AT & T's Response to the Plan of Reorganization in which it is stated that Bellcore would provide to the Regional Companies "systems engineering, generic requirements, and technical evaluation functions" to assist them in making individual purchasing decisions, and that Bellcore's technical evaluation function "includes technical evaluation of design alternatives." [52] All of this, including the failure further to define "generic requirements," indicates to the Department that some design is permitted, and some is not, that no boundary can be discerned between permitted and the prohibited design, and that accordingly the dimensions of the decree's manufacturing restriction cannot be ascertained.[53]

These arguments are not persuasive.[54] All the references cited by the Department are to exchange services or the design and engineering of *exchange networks* [55]—that are permitted both by the language of the decree and the intention of its authors—

and none of them is to the design and development of telecommunications or customer premises *products*—that are prohibited. The distinction was made clear as early as 1983, in connection with the adoption of the AT & T Plan of Reorganization, when AT & T stated in its Response to Comments on the Proposed POR (at 535) that "the process [of systems engineering and specification of generic requirements by an Operating Company] merely informs vendors of [Operating Company] needs and requirements. The specific design of the product, including its features and functions within the broad parameters of the generic requirements ... will be determined by the manufacturer." [56]

Nor is that distinction surprising or difficult to apply either in theory or in practice.[57] The design, maintenance, and operation of the exchange networks constitutes the principal business of the Regional Companies under the decree, and it would be specious to argue that they are prohibited from engaging in this essential facet of that business.

But the performance of such work is a far cry from the design of specific *prod-*

---

**51.** Department Response at 24.

**52.** Department Response at 25.

**53.** Department Response at 27.

**54.** Similarly unavailing are Department and Regional Company references to the decree requirement (section I(A)(1)) that the companies have the right to sublicense patents to manufacturers. These provisions apply where a manufacturer has designed equipment for which he lacks a cross-license or sublicense agreement; they do not involve the design of equipment by the Regional Companies. *Western Electric Co.,* 569 F.Supp. at 1087–88, 1089 n. 134.

Similarly, there is a sharp distinction between the design and development of software that is permitted to the Regional Companies and the design and development of software integral to equipment hardware, also known as firmware, that "is a matter of manufacturing design" and is prohibited. *See* Plan of Reorganization (POR) at 342–68; AT & T POR Response at 427, 423–53; Department of Justice POR Response at 145–48. As for the software "waivers" the Court has granted, it is plain that they provide no authority to the Regional Companies to enter businesses barred to them by the decree's core restrictions. *See* Department of Justice Motion of March 28, 1985 at 3, which emphasized that

the inclusion of specific decree restrictions in waivers was unnecessary and might actually create confusion by suggesting that other, unspecified restrictions were being waived. It is part of manufacturing design to decide how to make a product, by means of hardware, software, or a combination of both, that will do the job asked of it by the functional specifications set out by a Regional Company. Given that these companies may not manufacture the hardware for telecommunications products, there is no basis for supposing that they may design or develop the algorithms which make the hardware work.

**55.** Department Response at 22, 23 n. 46, 24–26.

**56.** The AT & T position on this issue was adopted by the Court when it approved the Plan of Reorganization. *Western Electric Co.,* 569 F.Supp. at 1114, 1116.

**57.** That is not to say that there may not be occasions when doubt may exist whether an activity represents network design and engineering or the design of products. Disputes in that regard, should they actually occur, will have to be resolved through the Department's normal enforcement activities under the decree, with resort, if necessary, to the Court.

ucts—a process that takes place *after* generic specification for the network have been determined and disseminated.[58]  It is at that point that an equipment manufacturer designs the telecommunications or CPE products as well as the detailed plans on how to build such products or systems. That design function is an integral part of "manufacturing," and as such it is prohibited to the Regional Companies under section II(D)(2).[59]

## V

### Order

For the reasons stated, AT & T's motion is hereby granted, and the Court declares, in the exercise of the authority vested in it by section VII of the decree, that the manufacturing restriction embodied in section II(D)(2) of the decree prohibits the Regional Companies' design and development of telecommunications products and customer premises equipment as well as their fabrication.

---

**58.** The functional specifications for products the Regional Companies wish to procure are the outgrowth of network, or systems, engineering activities.  Each Regional Company selects which new features, functions, and services will provide the best overall quality telecommunications service at the lowest cost; it determines whether microwave, radio or optical fiber, copper, or some other technology is to be deployed; and it decides where various feature and functions will be provided, whether it be in a switch, an adjunct processor, a remote module, the transmission equipment, or some other part of the network.  Research into these generic requirements is designed to determine what might be useful in enhancing the performance of the network, that is, to "inform vendors of the features and functions that the BOCs want or need in the equipment they purchase." *Western Electric Co.*, 569 F.Supp. at 1114, 1116.  It is on these bases that the Regional Companies were assigned personnel and resources from Bell Laboratories to support this type of research; the employees and other resources involved in equipment design, development, and fabrication remained with AT & T.  *See Western Electric Co.*, 569 F.Supp. at 1128–29; POR at 342–47; AT

& T's May 22, 1987 Reply Comments at 75–76 n. ***; AT & T POR Response at 503–36.

Based on the functional specifications disseminated by the Regional Companies, each of the competing manufacturing companies then determines how best to meet the stated requirements, and it designs, develops, and produces a sample of the proposed product, and replicates the product's final version.  Included in this work is engineering design, product development, fabrication engineering, and actual production.  Engineering design entails the making of detailed technical requirements for the hardware or software to be produced and their translation into specifications for component parts.  From these specifications a prototype is created to be tested and refined.  Finally, fabrication arrangements are made, and the product is produced in quantity.

**59.** The Department has described the integration of product design and development activities with the exchange function of procuring equipment for a telephone company's own use as presenting an "inherent conflict."  Department of Justice Third Statement of Contentions and Proof at 1078 (January 10, 1980).