UNITED STATES of America, Plaintiff,

v.

WESTERN ELECTRIC COMPANY, INC., et al., Defendants.

Civ. A. No. 82–0192.

United States District Court, District of Columbia.

March 7, 1988.

Charles F. Rule, Acting Asst. Atty. Gen., Barry Grossman, Chief, Communications and Finance Section, Nancy C. Garrison, Asst. Chief, Communications and Finance Section, Edward T. Hand, Asst. Chief, Foreign Commerce Section, Ben Giliberti, Atty., Antitrust Div. U.S. Dept. of Justice, Washington, D.C., for U.S. Dept. of Justice.

John D. Zeglis, Jim G. Kilpatric, Francine J. Berry, Basking Ridge, N.J., Howard J. Trienens, David W. Carpenter, Chicago, Ill., Ben W. Heineman, Jr., Sidley & Austin, Washington, D.C., for AT & T.

Thomas P. Hester, John Thorne, Ameritech, Jeffrey J. Kennedy, David P. Boyd, Kirkland & Ellis, Chicago, Ill., Donald E. Scott, Alfred Winchell Whittaker, Kath-

erine C. Zeitlin, Kirkland & Ellis, Washington, D.C., for Ameritech.

Robert A. Levetown, John M. Goodman, James R. Young, Washington, D.C., for Bell Atlantic.

Norman C. Frost, Mark D. Hallenbeck, BellSouth Corporation, Atlanta, Ga., Abott B. Lipsky, Jr., King & Spalding, Washington, D.C., for BellSouth.

Raymond F. Burke, Gerald E. Murray, Mary McDermott, Melvin A. Cohen, NYNEX Corp., White Plains, N.Y., for NYNEX.

Robert V.R. Dalenberg, Paul H. White, Kathy A. Hackmann, Richard W. Odgers, Mary Cranston, Pillsbury, Madison & Sutro, San Francisco, Cal., Rex G. Mitchell, Reno, Nev., Stanley J. Moore, Washington, D.C., for Pacific Telesis Group.

Edgar Mayfield, James S. Golden, Mary Whitten Marks, Gregory J. Christoffel, Southwestern Bell Corp., St. Louis, Mo., Liam S. Coonan, Southwestern Bell Corp., Washington, D.C., for Southwestern Bell Corp.

David I. Shapiro, Richard C. Schramm, James vanR. Springer, Joel B. Kleinman, Dickstein, Shapiro & Morin, Washington, D.C. (Laurence W. DeMuth, Jr., Stuart S. Gunckel, David S. Sather, Alan J. Gardner, Cameron R. Graham, of counsel), for U S West, Inc.

Chester T. Kamin, Thomas S. Martin, Michael H. Salsbury, Anthony C. Epstein, Glenn B. Manishin, Christopher S. Vaden, Carl S. Nadler, Jenner & Block, John R. Worthington, Sr. Vice President and Gen. Counsel, MCI Communications Corp., Washington, D.C., for MCI.

## OPINION

HAROLD H. GREENE, District Judge.

Under the terms of the decree,[1] the Regional Companies are prohibited from providing "information services." *AT & T,* 552 F.Supp. at 227. An information service is defined as "the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing or making available information which may be conveyed via telecommunications." *Id.* at 229. On September 10, 1987, the Court stated that it was prepared to exempt from the information services restriction the transmission of information generated by others, and it invited the parties and intervenors to submit proposed orders and memoranda detailing with particularity the necessary ingredients of an information transmission system. *United States v. Western Electric Co., Inc.,* 673 F.Supp. 525, 597 (D.D.C.1987) (hereinafter referred to as "Opinion, 673 F.Supp."). A total of some 59 organizations and individuals have filed comments, a number of them several documents (including responses, replies, and the like).

As the Court has had occasion to indicate before, unlike the interexchange and manufacturing issues, which are largely open and shut, the information services questions are closer and more debatable. After carefully considering the matter once again, the Court, for the reasons elaborated on below, has made the following decisions, based upon competitive considerations and upon issues of public policy relating to the economic and social benefits that may be derived from a substantial expansion of information services.

First, the Regional Companies will be permitted to engage in the transmission of information, but the generation of information content, one of the core ingredients of the decree growing out of the *AT & T* case, will continue to be prohibited. Second, for the present, the transmission system to be used will be that delineated in the Court's September 10, 1987 Opinion; however, the Regional Companies may freely develop and use differing applications of that system. Third, the Regional Companies will be allowed to employ alternative transmission systems as and when they are able to propose method-

---

1. *United States v. Am. Tel. & Tel. Co.,* 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom. Maryland v. United States,* 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983) (hereinafter referred to as "*AT & T,* 552 F.Supp.").

ology that will in practice preserve the content-transmission dichotomy. Fourth, the Regional Companies will be permitted to enter the voice storage and retrieval markets.

In brief, the Court's decision combines the grant of wide flexibility to the Regional Companies with respect to transmission systems and voice storage applications, with a continued prohibition on the generation and manipulation of information content. It is the Court's expectation that this easing of the information services restriction will avoid anticompetitive effects, and that it will at the same time bring this nation closer to the enjoyment of the full benefits of the information age.

# I

## Need for Retention of the Restriction on the Provision of Information Content

In the consideration of the papers filed with the Court, it is useful, first of all, to consider, most broadly (1) what it is that the Regional Companies must continue to be prohibited from doing and why, and (2) what segment of the information services market may now be opened to them.

The comments from several Regional Companies indicate that they may not have adequately understood the reasons for the line of business restrictions in the decree. Arguments are advanced again and again that, if only the companies were allowed to enter the markets forbidden to them under the decree, they would be able to innovate unlike independent corporations in the same markets, and that they would be able

to improve America's foreign trade position, competing vigorously and effectively with foreign manufacturers and other providers. There are two major reasons why these recurring arguments are not well taken.

At the most elementary level, the Regional Company contentions are irrelevant: the decree provides in so many words that the restrictions [2] "shall not be removed unless any particular Regional Company makes a showing ... that there is no substantial possibility that it could use its monopoly power to impede competition in the market it seeks to enter." Section VIII(C) of the decree.

In the context of the triennial review of the decree,[3] the Regional Companies supported the Department of Justice motion for, *inter alia,* a complete removal of the restriction on the provision of information services, without distinction between content and transmission. The Court found, however, that the Regional Companies continue to possess bottleneck control over the local exchange facilities,[4] and that information services are especially vulnerable to even slight manipulation and discrimination by the entity providing transmission. Opinion, 673 F.Supp. at 562–67. Because the requirements of section VIII(C) had not been met, the Court concluded that the restriction on the sale by the Regional Companies of information content must be maintained. *Id.* at 567. The situation is thus unchanged and, inasmuch as the Regional Companies are unable to make the requisite section VIII(C) showing, they continue as a matter of law to be bound by the section II(D)(1) restriction.

---

**2.** This includes the restriction on the provision of information services in section II(D)(1) of the decree.

**3.** At the time the decree was entered, the Department of Justice agreed to report to the Court every three years concerning the continuing need for the restrictions imposed by the decree. *See AT & T,* 552 F.Supp. at 195. The first such report was submitted on February 2, 1987. After consideration of that filing, the responses of parties and intervenors, and three days of oral argument, the Court issued the Opinion referred to at p. 2, *supra,* granting in part and denying in part the Department's motion.

**4.** For example, the Court found, based on the studies of the Department of Justice's own expert, that only one-tenth of one percent of inter-LATA traffic volume, generated by one customer out of one million, is carried through non-Regional Company facilities to reach an interexchange carrier. Opinion, 673 F.Supp. at 540. The local monopolies in the various areas where the Regional Companies operate are thus virtually as tight as they were in 1982 when the decree was signed, when the restrictions were first imposed, and when the same bottleneck monopolies were controlled by the Bell System.

In any event, it is wholly unlikely that the removal of the restrictions would lead to a flowering of research and of more and better competition with foreign producers.

In the first place, the Regional Companies have no experience with the generation of information. The production of and changes in the form of information are the province of hundreds of professions, occupations, and trades, from book publishers to stock market analysts to the providers of theater and music admission tickets. Those involved in these businesses possess the necessary expertise; the Regional Companies do not. It would be absurd to lift the restriction on the provision of information content based on the theory that the Regional Companies know more about and are better able to capitalize on these businesses than those who have made these endeavors their lives' work.

Furthermore, the Regional Companies are not needed in these aspects of American business; they could flourish therein only if they used their telecommunication monopolies to disadvantage competitors in these markets; and their participation therein merely because they are in the business of transmission would be an aberration.[5]

Furthermore, an entry of the Regional Companies into the content-generation mar-
kets would be positively harmful. Experience has shown that there is less innovation and hence less effective competition with products manufactured abroad when the significant players in the American market are monopolists than when the participants are free of monopoly pressure and thus have the incentive that exists, in a market characterized by vigorous and broad competition, to lower price and to offer better products.[6]

The American economic system proceeds on the basis of the assumption—closely related to the assumption underlying our political system—that competition is far more likely to lead to the production of more and better products and their distribution to consumers at affordable prices than a market dominated by a monopoly, whether governmental or corporate. In fact, as the Court has previously noted,[7] more new and innovative telephone products have appeared on the shelves of this country's retailers in the four years since divestiture than in the preceding twenty. It is ironic that, at the very time that several of America's opponents—e.g., the Soviet Union and the Peoples Republic of China—have finally learned and have begun to implement the lesson that competition is superior to monopoly,[8] some of the largest American corporations [9] have been

5. Interestingly, the French Teletel (see infra) operates quite successfully as a transmission system that (1) transmits requests from subscribers for information and (2) furnishes requested material from independent information providers to the requesting parties. Teletel's absence from the information content market is not compelled, as here, by an antitrust judgment, but the French creators of their system must have known that to make the telephone company a potential competitor for every provider of information in France could only have had disastrous consequences.

6. For example, the Court found with respect to manufacturing, where there has been four years of experience in a competitive market to compare against the market dominated by the Bell System monopoly, that "there has been a flowering of research, development, innovation, introduction of new products, and quality assurance; new firms have entered the market; prices of equipment have declined dramatically (according to some by as much as fifty percent in some categories); and competition flourishes in a
market that had seen relatively little of it before. The equipment market now consists of some six or eight very large firms, one to two hundred medium-sized firms, and hundreds of still smaller, vigorous and inventive firms, some of them in profitable relationships with one or more of the Regional Companies." Opinion, 673 F.Supp. at 560 (footnotes omitted).

7. Opinion, 673 F.Supp. at 601 n. 330.

8. For reasons similar to those that led to the AT & T divestiture, other nations, e.g., the French, British, and Japanese, have also begun the process of transforming their telecommunications industry into a competitive one on the American model. See Washington Post, "Japan's Phone Monopoly Goes Private," April 1, 1985, section A12; Communications Week, "New Initiatives in France, Germany May Open Telecom Markets," September 21, 1987, at 1.

9. In terms of assets, seven out of twenty of the largest corporations in the United States are the

successful in persuading the Department of Justice that a return to monopoly, their monopoly, is in the public interest.

In brief, even if the legal barrier of section II(D)(1) of the decree were not crystal clear, there would be no warrant for a removal of the restriction on the provision by the Regional Companies of the content of information services, one of the core restrictions of the decree. That restriction will accordingly remain.

## II

### *Removal of the Restriction on Information Transmission*

In its analysis of the restriction on information services, the Court recognized last fall that substantially different considerations govern Regional Company entry into the transmissions aspect of information services, also known as information gateway services,[10] than would their participation in the market for the compilation, origination, or manipulation of information. Opinion, 673 F.Supp. at 587–97. The potential for anticompetitive behavior by the Regional Companies with respect to transmission only is very much limited, if only because, in the absence of their participation in the generation or manipulation of content, these companies have little incentive for discrimination against competitors in the information market.

Moreover, broad public policies in addition to those stemming from antitrust law favor the elimination of the restriction on transmission.[11] The Court has previously found that the efficient, rapid, and inexpensive dissemination of specific information as called for by individuals in all segments of the population will benefit the nation and its economy. Opinion, 673 F.Supp. at 589–90. The Court now reaffirms and underlines that finding.

The videotex [12] industry, which has the potential for furnishing wide varieties of information, as needed or wanted, to large segments of the population, has grown only slowly. This is so particularly with respect to the home videotex market. The fact is that, unlike in some foreign countries, consumer-oriented videotex services on a substantial scale remain largely in the future in the United States. Opinion, 673 F.Supp. at 587–88.[13]

Yet if consumer-oriented videotex services were made available on a large scale, the economic and social welfare of the American people could be substantially advanced. It is difficult to overestimate the significance of this potential. Information services, as the experience of existing domestic providers and with the foreign systems has shown, can come in an amazing

---

regional telephone companies. In terms of sales, all seven Regional Companies rank in the Fortune 50.

**10.** The networks in which these services are performed are also sometimes referred to as value-added networks (VANS).

**11.** In its approval of the decree in this case, the Court took account of such public policies as the congressional expectation of universal telephone service and the desirability under the First Amendment of achieving diversity in the sources of public information. *AT & T,* 552 F.Supp. at 183, 191–94; *see also* Opinion, 673 F.Supp. at 583–87.

**12.** The term "videotex" refers to a great variety of easy-to-use interactive data services. According to the Huber Report submitted by the Department of Justice in connection with the triennial review, "videotex arranges information in a text or graphic format on a video display with user input through a keyboard." P. Huber, "The Geodesic Network: 1987 Report on Competition

in the Telephone Industry," (hereinafter referred to as the "Huber Report") at 1.29 n. 46. The Department has asserted that the Huber Report formed the principal factual basis for its position in this Court on the decree restrictions.

**13.** Indeed, several efforts to provide videotex services have failed. In March 1986, Knight-Ridder Newspaper Inc.'s viewtron service, which provided home subscribers in several markets with news, stock prices, and shopping information, folded without having made a profit. Around the same time, the Times Mirror Company's gateway videotex services closed down after losing approximately $30 million. *Washington Post,* "Videotex's Timing is Questioned," March 20, 1986, section E1. However, Compuserve, Inc., a videotex provider, claims to have 375,000 subscribers to its consumer information services at the present time, offering 1,100 consumer information services and data bases.

scope and variety.[14] If developed to their full potential, these services could in some ways revolutionize American intellectual, social, cultural, and economic life.

In a practical sense, the pervasive services network necessary to create a large and vigorous nationwide market is unlikely to develop without the participation of the Regional Companies.[15] Because of their presence everywhere and their relationship with every user of the telephone, only these companies would be able to furnish the necessary infrastructure components for the distribution of efficient videotex services on an integrated basis; at a minimum they could furnish these components more easily and at less cost than other potential suppliers. Opinion, 673 F.Supp. at 591.

To be sure, some of the requisite services can be and currently are being provided through the customer premises equipment market,[16] and through existing independent videotex suppliers. What is missing, however, is the easy access, both for the providers of information services and for consumers, to a vast, pervasive system that only the local telephone companies, operating in every state of the Union, can readily supply. It is only on that basis that the mass market can be created that will allow information services to become available and used on a truly national basis.[17]

Beyond that, while entry of the Regional Companies into information gateway services entails some risk to fair competition, such entry, by a group of companies which collectively serve practically every business and household in the country, may actually lead to an increase in competition, as awareness of the services and their potential grows, and as the customer base becomes much more widespread.

Having weighed the wide benefits potentially accruing to the American economy and its consumers against the narrow likelihood of monopolistic behavior on the part of the Regional Companies were they to be permitted to enter [18] the transmission market, the Court concluded on September 10, 1987, that a limited relaxation of the information services restriction was warranted. It is on this basis that the Court announced its intention to modify the decree pursuant to section VIII(C) so as to permit the Regional Companies to compete for the provision of transmission facilities to the infor-

---

**14.** The Court last fall listed some of the potential information services, as follows:

> Without attempting to be exhaustive, the following lists some of the more obvious videotex-related economic services that exist elsewhere and that might be made available in this country: (1) in banking, videotex could give customers direct and immediate account information and fund transfer capability; (2) in brokerage, there could be instant evaluation of current portfolios and access to alternative investment opportunities; (3) with respect to customer service by a variety of business enterprises, arrangements could be made for immediate access to information about outstanding balances, order fulfillment, accrued interest, and the like; and (4) with respect to shopping services, videotex could provide direct and immediate access to the prices and descriptions of a wide range of products and services that could be purchased electronically.
>
> Outside the economic sphere, videotex is used in France, and could presumably be applied in the United States, for such services as (1) travel information, restaurant reviews and reservations, hotel and rental car information, and airline schedules; (2) instantaneous access to ticketing for sports, musical, cultural, and entertainment events; (3) information concerning meetings of associations, including schedules, performers, and speakers; (4) social messaging; (5) access to federal and local governmental information; (6) language instruction; (7) reprints of newspaper and magazine articles; and (8) employment services.

Opinion, 673 F.Supp. at 589–90 (footnotes omitted).

**15.** In this respect, the transmission of information services is unlike the provision of information content, telecommunications manufacturing, and long distance services—all of which can and do function exceedingly well without Regional Company participation.

**16.** *See* Reply of Hayes Microcomputer Products, Inc., at 4.

**17.** Whether such a mass market will actually be created will depend of course on the organizational, technical, and marketing skill of the Regional Companies.

**18.** Under the decree as it now stands, the Regional Companies may not perform most of the "gateway" functions necessary to information transmission.

mation services industry, and that it invited comments from interested parties and intervenors with respect to modes of implementation. Opinion, 673 F.Supp. at 597. Having received and considered these comments, the Court sees no reason to alter its view on the fundamental question at issue.

The Court was and is an enthusiastic supporter of large-scale information services for the benefit particularly of individual consumers and small businesses. Members of these groups will be able to partake of these revolutionary new services only if a mass market therefor is established, while vast commercial enterprises generally have access to such services now.

The decree in this case has been responsible for a number of favorable developments: long distance rates have dropped substantially;[19] the price of telephone equipment has similarly been reduced;[20] innovatives in telephone equipment available to the average person have appeared on retail shelves in astounding numbers and configurations;[21] and although the Regional Companies, which retain their local monopolies, initially raised local rates, that increase appears to have been largely halted during the current year.

Now would appear to be the time for adding to the achievements built on the competitive market established by the decree a system of broad-based, efficient, reasonably-priced information services available to all who want them. On this basis,

the Court will rescind the restriction on the provision of information services in section II(D)(1) of the decree insofar as the transmission of such services is concerned. What remains to be discussed are the specific applications of this decision.

### III

#### *The Teletel System*

In its September 10, 1987 Opinion, the Court relied heavily upon the description of the services provided by Teletel, the French videotex system, in reaching conclusions about the feasibility and the likely structure of information services in the United States. This was so largely because the French system was and is the best known, the most widespread, and the one technologically most advanced, at least on a large scale basis. Moreover, Teletel had been supported by various parties to this litigation as an example of the technological benefits the Regional Companies could supply if the decree restrictions were relaxed. U S West especially[22] called the Minitel network "the model upon which we would build" the American system.[23] That company also repeatedly touted the French experience as representing the cutting edge of the Information Age.[24]

▮ However, the French experience is merely one of the possible permutations that a coherent information services net-

---

**19.** The decrease in rates nationally is estimated at thirty-five percent since divestiture in 1984.

**20.** Prior to the AT & T divestiture, the Bell System furnished telephones to subscribers only on the basis of an unending monthly rental, without any opportunity for purchase. Now telephone instruments are available for sale in all colors, shapes, and degrees of sophistication, at prices amounting to a small fraction of the total amount of the overall rental fees.

**21.** To cite only the most obvious, features such as automatic call repetition; one-button calling for dozens, even hundreds, of numbers; cordless phones; phones that respond to verbal commands—all of them non-existent or exceedingly rare just three or four years ago—are now commonplace in many households. Mobile phones in automobiles and airplanes are fast coming to match the ubiquity of these features.

**22.** The U S West proposal was advanced jointly with the Regional Companies' traditional opponent in this field, the American Newspaper Publishers Association. As such, it represented the most substantial and fully considered of the concrete submissions. The proposals of the other Regional Companies were far more diffuse. *See infra.*

**23.** Hearing of July 1, 1987, Tr. at 362.

**24.** In a characteristic reversal of position, U S West dismissed the French Teletel System as already obsolete and not particularly well suited to the American environment, just as soon as the Court appeared to have accepted the original U S West position in its September 10, 1987 Opinion, and as it might have appeared to that company that its demands could therefore be safely ratcheted upward. *See* U S West Memorandum at 2–3.

work in this country might take. In the first place, the United States is not France. This country, unlike France, has a healthy and growing personal computer market with which direct interaction will be possible. Also, there has been here some movement into the information services field by non-telephone enterprises.[25] Most importantly, the French government's subsidization of millions of "dumb" terminals[26] would be difficult to duplicate in this country either on a government-subsidy or a telephone company-subsidy basis.[27]

It is obvious from this discussion that here the most effective method of interconnection between the information providers, through the Regional Companies, to the consumers could turn out to be different, at least in theory and in the longer run, from that employed in France, and so could the infrastructure.

Additionally, advances in the communications and computer fields are said to have occurred since the unveiling of the French system, and further and broader advances are likely to occur in the future. On that basis, too, the existing Teletel system should not be cast in concrete as the sole option available to United States providers of transmission services.

## IV

### Other Alternatives

It was with these considerations in mind that the Court requested the parties to make further submissions following the issuance of the September 10, 1987 Opinion, and it was on that basis that it expected to receive detailed contentions and recommendations both of a legal and a technical nature concerning the requirements of an effective infrastructure for the transmission of information services. Unfortunately, the response was disappointing.

In the first place, the Regional Companies by and large emphasized their determination to have the Court reconsider its September 10, 1987 ruling against removal of the entire restriction on information services, including content. A reprise of that controversy was clearly not the purpose of the post-September round of briefs and, to the extent that this concentration on what had by then become a moot subject consumed space and energy, it was of assistance neither to the authors of the submissions nor to the Court.[28]

25. Networks have been developed by entities such as CompuServe, The Source, Trinex, General Electric Information Services, Quantum Computer Services, and the two independent telephone companies, each with its own idiosyncracy and particular modes of technology.

26. These terminals are relatively inexpensive and unsophisticated, but they are adequate as parts of an information system.

27. Some commentators have suggested that information services will not survive in this country without such a program for the cost-free dissemination of dumb terminals. That may well be the case, but it is not an issue for the Court to decide. The United States government is unlikely to adopt such a policy, and the Court has neither reason nor power to require it or the Regional Companies to do so. This is, to be sure, an option that might be pursued by those interested in entering the market, but it involves a business decision unrelated to questions of antitrust law or enforcement.

In fact, the Court's influence in this matter is limited to resolution of the question whether the Regional Companies will be *permitted* to engage in the transmission of information services.

Once such permission is granted, it is solely for the individual companies to determine whether their entry into that market would be economically feasible and otherwise desirable. *See also* note 17, *supra.*

Under the decree, the Regional Companies may not engage in the manufacture of consumer premises equipment, *see* section VIII(A), and dumb terminals fall within that prohibition. Opinion, 673 F.Supp. at 596. However, nothing in the decree would preclude the Regional Companies from providing such hardware to the consumers, if it were obtained from a third source.

28. The Department of Justice likewise expended much effort on matters already decided. Thus, the Court was told once again that the Department would prefer a complete removal of the information services restriction as of all other restrictions on the Regional Companies; that the Court's imposition of restrictions to prevent anticompetitive activities would amount to an assumption of regulatory functions; that requirements of nondiscrimination or of structural separation to prevent cross-subsidies are beyond judicial authority, and the like. *See* Response of the Department of Justice, filed November 16, 1987. In what must be a unique

Beyond that, the Regional Companies repeatedly expressed their need and desire for flexibility with regard to their construction of an infrastructure, and some of the companies' submissions begin and end with such a plea. Even memoranda which do provide details, however, do not demonstrate that the flexible authority sought therein would preclude the generation or manipulation of the content of information —the key issue in view of the Court's previous rulings.[29] For obvious reasons, the Court may not, consistently with its obligations under the decree, rely for such preclusion on so important a subject on Regional Company self-restraint.[30] Authorizing language with technologically amorphous descriptions of what will actually be done constitutes the equivalent of a carte blanche to depart from transmission into content, and such a departure, as indicated, cannot be approved.[31]

Having received no submissions that could be regarded as acceptable alternatives to the system tentatively approved last fall, the Court could have decided not to conduct any further inquiry of its own but simply to rest on its existing decision:

to permit the use of the Teletel system as described on September 10, 1987, without exploration of other alternatives. However, as pointed out above, it is the Court's belief that information services have a very large potential value for the American public. In view of that consideration, and in view of the possibility that the transmission of such services could be achieved, either now or in the future, by means more advanced, more economical, or both, than those described on September 10, 1987, the Court decided to consider the various other alternatives that appear to exist.

## A. *Prohibition of Content Generation*

One means of achieving the Court's objective of encouraging the broadest flowering of technology for the transmission of information would be simply to prohibit the generation and manipulation of the content of information, without further definition or explanation. This would authorize the Regional Companies to engage in transmission activities, again without bounds or boundaries, and it would leave completely open the means to be used for in the exercise of the transmission function. This,

occurrence, at least in this litigation, the Department of Justice actually found the proposal submitted by U S West, a Regional Company not known for the modesty of its ambitions, to be too restrictive. Response of the Department of Justice at 6–9. The Department's position becomes more understandable perhaps when it is considered that its officials met ex parte with Regional Company executives regarding the removal of the decree restrictions long before the triennial review (*see* note 3, *supra*) and even long before the Huber Report (*see* note 12, *supra*) was written and submitted.

**29.** For example, NYNEX proposes that the Court expand permitted infrastructure components to include store and forward, navigation translation, custom screens, and transaction support. Its only justification for this expansion is that those features would "create a network environment that encourages the offering and use of a wide variety of information services." NYNEX Memorandum at 8. NYNEX neglects to explain, however, how the Regional Companies might offer these services without manipulating content. While some of these activities might be accomplished without interfering with content, there is no guarantee that it will be so. Take, for example, credit validation services, which NYNEX would seek to provide

as a "transaction support." One method of validation involves the use of computer software to verify the identity of a merchant, route the query to a proper back-end network, log the response, record the data, and send confirmation to the merchant—a clear manipulation of content. Huber Report at 12.7–12.8

**30.** Some of the Regional Companies freely acknowledge that their proposals would cross the line between transmission and content. *See, e.g.,* Southwestern Bell's comment that "it is not enough that the telephone network be open only to the accurate transmission of information" (Memorandum at 18), and Pacific Telesis' observation that "[s]ome may claim that our proposed order goes beyond the intent of the Opinion in permitting Regional Company activities" (Memorandum at 1).

As explained in greater detail below, despite the Court's willingness to permit divergences from the Teletel model, it will not endorse Regional Company entry into transmission activities absent a showing that these activities will not involve content.

**31.** It may be that some of the parties' submissions are deliberately vague to achieve a quick entry into content, or it may be, on the other hand, that it is not possible to describe the

however, would be impractical for two interrelated reasons.

In the first place, such broad, and unbridled prohibitions and authorizations would almost inevitably lead to an incessant involvement of the Court with the industry. Either the Regional Companies would be flooding the Court with requests for construction of the decree prior to entering fields that could legitimately be regarded as being close to the line between transmission and content,[32] or the companies' competitors or potential competitors would be inundating the Court with requests for enforcement or sanctions based upon their perception that the Regional Companies had crossed the line from the permitted to the prohibited.

An alternative to that scenario, and one that likewise cannot be excluded based on past performance, would see the Regional Companies simply resolving all reasonable and unreasonable doubts in their own favor,[33] and entering the content-based information services market on a wholesale basis, leaving it to the Department of Justice and to the Court to initiate and pursue the enforcement actions necessary to rein these companies into what the decree actually allows. This kind of approach would thus have the perverse effect of substantially increasing rather than decreasing de-

tailed judicial involvement with the telecommunications industry—an obviously undesirable development.

In short, while a simple prohibition on content generation, with an equally simple authorization to engage in transmission, would have the virtue of making the Court's task easier today, for the long run it would sow the seeds of enormous difficulties and disputes, harmful to the parties, to the Court, and to the industry.

### B. *Electronic Publishing*

A somewhat similar approach—one that was suggested by a number of parties, including some Regional Companies[34]—would be to make the decree's electronic publishing definition the benchmark of information content. Electronic publishing is defined in section VIII(D) of the decree as:

> the provision of any information which AT & T or its affiliates has, or has caused to be, originated, authored, compiled, collected, or edited, or in which it has a direct or indirect financial or proprietary interest, and which is disseminated to an unaffiliated person through some electronic means.[35]

The suggestion is made that the information services restriction of section II(D)(1) be amended to provide that only the activi-

---

ingredients of an as yet unknown and untried system that is limited to transmission.

**32.** As indicated *infra*, some transmission activities necessitate relatively slight changes in content. For that reason, among others, the line between permissible transmission and impermissible generation or manipulation of content is not always obvious.

**33.** For example, following the Court's decision with respect to the manufacturing restriction, some of the Regional Companies claimed that they had made elaborate plans regarding research and development preparatory to fabrication, on the theory that this was clearly permitted to them, although the trial record and the Court's Opinion which described that record clearly showed that research and development had been the facet of manufacturing that was the primary means for Bell System discrimination. *United States v. Western Electric Co.*, 675 F.Supp. 655, 662–63 (D.D.C.1987). One of the Regional Companies, Bell Atlantic, actually claimed that the "decision unlawfully expands the scope of the manufacturing prohibition" and

another, Bell South, expressed "utter frustration at a ruling which goes far beyond clarifying any ambiguity...." *Telecommunications Reports*, December 7, 1987, at 2. Even the Department of Justice, otherwise entirely in agreement with the Regional Companies, concluded, based on the record, that "manufacturing" includes research and development for purposes of the decree. Opinion, 675 F.Supp. at 664–65.

At least one Regional Company, Southwestern Bell, was found to have engaged in activity which violated the manufacturing restriction when it acquired Tsunami Technologies Corporation. *See* Report of the United States Concerning Southwestern Bell Corporation's Violations of the Modification of Final Judgment, February 12, 1988.

**34.** *See, e.g.,* Bell Atlantic Memorandum at 1–2, 3–6; Southwestern Bell Memorandum at 4.

**35.** Under the decree, the section VIII(D) electronic publishing restriction reins in AT & T. The suggestion presently made is that this restriction be extended to the Regional Companies

ties encompassed under section VIII(D) remain prohibited. In the eyes of some commentators, this definitional approach will "avoid[ ] dragging the Court into the endless task of listing the technical capabilities needed for an effective gateway." [36] These commentators also emphasize the rapid pace of market and technological change in the industry, and they suggest that unless this method of proceeding is adopted, the Court will be inundated with requests for rulings on a function-to-function basis.

There is some merit to this argument. Simplicity is always a virtue, especially in a case as complex as this. Beyond that, the Court has no desire, nor reason, to become the arbiter of disputes over the merits of the details of particular technologies, nor does it have an interest in establishing a waiver process that would delay the implementation of advances in infrastructure technology.

However, while the proposed definition is simple, it is also inexact and underinclusive. "Electronic publishing" is not all that must continue to be prohibited to the Regional Companies, for information content is a wider concept than that. For example, if a Regional Company were prohibited only from entering the electronic publishing business, it could validly offer such services as timesharing, credit checking, and electronic mail, although each of these services involves the generation or manipulation of content and for that reason should remain prohibited to the Regional Companies under any general restriction on content.[37] Thus, wholesale adoption of the electronic publishing definition does not constitute an appropriate alternative any more than does the straight prohibition on content.

Moreover, the electronic publishing proposal suffers from the same vice as that discussed under Subpart A, *supra*—it leaves too large a scope for interpretation and hence evasion. It is the Court's experience that, regardless of the level at which a line is drawn between the permissible and the impermissible, the Regional Companies will challenge that line, and either turn to the Court for a ruling or enter the field and await enforcement proceedings, if any. The electronic publishing alternative is therefore rejected.

### C. Detailed Approvals

For obvious reasons, the Court will not establish a procedure that would avoid altogether the adoption of a definition either of transmission of information or of information content. The adoption of this alternative would require the Regional Companies to apply to the Court, again and again, for a function-by-function approval of relevant technology as such technology may occur to a Regional Company and as its installation may seem to be called for.

Such an approach would be a certain prescription for paralysis in the information services market. No responsible company would venture to expend capital on the design and installation of a technology if permission for proceeding with various facets was entirely uncertain but had to be applied for and secured some time in the future. Such a micromanagement approach by the Court would also be undesirable from the point of view of the Court and from that of certainty and stability in the industry as a whole.

### V

#### Permitted and Prohibited Transmission Services

Having found unsatisfactory the various alternatives discussed *supra*, the Court will now describe what it is the Regional Companies may and may not do under the newly liberalized information services restriction on the basis of the fundamental decisions made herein.

First. To the extent that the Court has already determined in the September 10, 1987 Opinion that the employment of various infrastructure components is necessary

---

in lieu of the section II(D)(1) information restriction. *See* note 39, *infra*.

**36.** Bell Atlantic Memorandum at 4.

**37.** The Court today approves Regional Company entry into the electronic mail market, but this is done after a separate evaluation of that market in a concrete setting.

to an effective information gateway, *see* Opinion, 673 F.Supp. at 592–95, these components are conclusively presumed to constitute transmission functions that the Regional Companies will be hereafter permitted to perform. No useful purpose would be served by repeating in this Opinion the parameters of these components or functions,[38] and the Court hereby adopts their description in the September 10, 1987 Opinion, as modified in Part VI, *infra*.

Second. The Regional Companies are being granted flexibility also to develop applications of these five components that differ in technology or detail from the Teletel system or the Court's September 10, 1987 description. However, such latitude is only permitted to the extent that (1) all specific restrictions and conditions laid down in the September 10, 1987 Opinion and this Opinion as to scope of the particular categories are observed; (2) no application of these categories involves entry into content-based functions; and (3) the services provided via these five categories of gateway functions are restricted to the transmission of information generated by others.

Third. At the other end of the spectrum, a categoric restriction is being maintained on those aspects of information services that are plainly content-based. These are, at a minimum, the kinds of services that are described in the decree as electronic publishing,[39] *see* Part IV–B, *supra*, but they extend, of course, beyond that. *See* pp. 10–11, *supra*.[40]

Fourth. It may be that the function of transmitting information without infringing on the content prohibition can be achieved by means of a system or systems using components other than those listed above. The Regional Companies have not suggested any such system or systems thus far,[41] and there is thus nothing before the Court in that regard. However, should such entirely new means to transmit information services without trenching on content be proposed in the future, the Court will consider such proposals sympathetically, in line with its general view of the importance to the public of advanced, broadly-available information services, and its general approach to refrain from straightjacketing the fledgling information services industry by imposing an unnecessarily rigid structure [42] through which it must develop.[43] Such proposals must of

---

**38.** The five functions referred to in the September 10, 1987 Opinion are (1) data transmission, (2) address translation, (3) protocol conversion, (4) billing management, and (5) introductory information content.

**39.** Naturally, the text of this definition will have to be changed slightly to accommodate the present problem, so that the minimum prohibition will read as follows:

... the provision by a Regional Company of any information which that Regional Company or its affiliates has, or has caused to be, originated, authored, compiled, collected, or edited, or in which it has a direct or indirect financial or proprietary interest, and which is disseminated to an unaffiliated person through telecommunications.

**40.** Among other services that are also clearly outside the transmission function are the maintenance of user profiles and their sale or release to others. *See* U S West Memorandum at 12–14; PacTel Memorandum at 16. Such profiles typically contain detailed information on users' favorite services, times of use, monthly expenditures, and usage habits, which would provide the Regional Companies with an almost insuperable advantage vis-a-vis other providers as a marketing tool. Regional Company control of

such data would also raise very sensitive privacy questions. *See* Response of CompuServe at 14–15.

**41.** It is possible that no transmission functions other than those so described are conceptually or technologically feasible. *See also* note 31, *supra*.

**42.** The direction of technology and the molding of the network must be informed by the whims of the consumer and the state of scientific experience. In order for the United States to develop a vigorous information services network, and to establish and maintain a leadership position in the world market, the Regional Companies should have available the means to design and administer a networking facility. Insofar as this goal is attainable without interfering with the core decree restrictions (*e.g.*, the generation and manipulation of content), the Court will not seek to introduce any artificial hurdles.

**43.** In this respect, proposals with the imprimatur of the Federal Communications Commission will be considered to be prima facie valid, as the Court recognizes that that body, through its studies in *Computer III* and enhanced services, has experience in this field.

course respect the no-content prohibition, and they should not merely constitute rearguments of issues previously rejected by this Court.

## VI

*Components of Transmission System*

As indicated *supra,* the Court is authorizing use by the Regional Companies of a system for the transmission of information generated by others that consists of the five components referred to in the September 10, 1987 Opinion, either in their present form or as appropriately modified. In this part of the Opinion, the Court discusses various questions that have been briefed by the parties regarding the configuration of these components, as well as several ancillary issues.

### A. *Audiotex and Videotex*

In its September 10, 1987 Opinion, the Court focused its analysis of transmission functions on those currently performed by Teletel, since it was that system which had been touted by various Regional Companies as the model through which the United States could enter the Information Age. The French system, however, is limited to videotex—it does not offer the wide range of services that would be available through the complimentary audiotex format.[44] The

Court sees no reason to create a competitive imbalance between voice and other services, and for that reason it will permit the Regional Companies to engage in the transmission of audiotex on the same basis as they may transmit videotex.

Audiotex services are available through ordinary touchtone telephones, and they therefore have the potential to become the largest and fastest growing segment of the information services market. To date, the widespread application of audiotex has been largely limited to time-of-day information and "976" services,[45] but expansion of the technical infrastructure could spur a radical transformation in that industry. Many of the services cited in the September 10, 1987 Opinion as ripe for provision over the information services network can easily be provided via vehicles other than videotex,[46] vehicles that may be equally valuable to a broad range of consumers, if not more so.[47]

Consistent with the goal of making "possible the transmission, on a massive scale, of information services originated by others, directly to the ultimate consumer," Opinion, 673 F.Supp. at 603, then, the Court will make no distinction between videotex and audiotex with respect to Regional Company involvement in the transmission of information services.[48] Any and

44. Audiotex allows consumer access to information through a regular telephone line and the use of a touchtone keypad. Huber Report at 6.3 n. 8. Unlike in videotex, the information is not received in written form either on a video display screen or on paper. Huber Report at 1.29.

45. "976" services are public announcement services, accessed through the local exchange companies, which provide short, uncomplicated, low-value, mass market information. Information flow is one way—to the user. To encourage frequent, impulse usage, billing is direct to the telephone number, on a per-call basis, without prior subscription. The access lines linking the switches of the information services providers to the public network have a 976 dial code that engages special telephone company billing services. The user is billed an additional per-call amount on his monthly telephone bill; the revenue from that extra charge is divided between the Regional Company and the information service provider. *See* Huber Report at 8.1, 8.3, 8.6.

46. Home banking, brokerage, retail services information, messaging, bulletin boards, and other such services are particularly adaptable to audiotex. *See* Opinion, 673 F.Supp. at 589–90.

47. Most American consumers already own or rent the access device required by audiotex—the telephone. Thus, audiotex could be enjoyed without the additional expense and bother of obtaining a separate terminal. *See* Response of Public Utilities Commission of California at 3–4.

48. Limited objections to this expansion have been expressed by some competing audiotex providers. *See* Phonequest, et al., Response at 3–4. The primary objection of the opponents appears to be that "there is no possible way in which the independents could compete with the [Regional Companies]." *Id.* at 4. These competitors fail to explain, however, why the potential for anticompetitive behavior is stronger in the audiotex field than in videotex. The mere fact that entry of the Regional Companies into the field will provide stiffer competition is not grounds for excluding them from the market. *See* note 88, *infra.*

all references to videotex, either in this Opinion or the September 10, 1987 Opinion, may be construed to include audiotex applications.

### B. *Electronic Directory Service*

On September 10, 1987, the Court stated that it would not remove the prohibition against Regional Company provision of electronic "Yellow Pages" directory services because such removal would give the companies the incentive and ability to discriminate against competing providers of directory services and against the publishers of classified and other advertisements. Opinion, 673 F.Supp. at 596. On the other hand, the Court decided that the Regional Companies would be allowed to offer electronic "White Pages" directories with respect to which such an anticompetitive potential did not exist. *Id.* From those simple declarations several Regional Companies have parsed an invitation to engage in the broadest possible electronic directory services, some so broad as to subsume almost all distinctions between White and Yellow pages.

These Regional Companies have interpreted the Court's statements regarding electronic directories as vesting in them the authority to provide electronic directory services that list general product and business categories, the service or product providers under those categories, the names, telephone numbers, and addresses of these providers, as well as services that allow customers to search the directory through the use of any of those categories.[49] Bell-South would add to these assumed grants of authority the capability to search by geographic location, and it would provide hours of operation, alternative phone numbers, and similar information for business and government listings.[50] And Bell Atlantic carries these misinterpretations to their

ultimate logical conclusion: it suggests that everything except display advertising could be provided under the rubric of "White Pages".[51]

■ Section VIII(B) of the decree grants to the Regional Companies the authority to produce, publish, and distribute printed "Yellow Pages" directories. Yellow Pages are described therein as "directories which contain advertisements and which list general product and business categories, the service or product providers under these categories, and their names, telephone numbers, and addresses." As the above discussion indicates, some Regional Companies now expect to have the right to provide electronic directories of that same nature under the label of electronic "White Pages," although they are not permitted to produce electronic Yellow Pages under the decree itself. *AT & T,* 552 F.Supp. at 194. That attempted usurpation of authority was rejected once before, and it is now again rejected.[52]

The provision of electronic "White Pages" directories encompasses only a listing of telephone subscribers, arranged in alphabetical order by name, with address and telephone number appended. No discrete directory of businesses, products, or services is allowed under the "White Pages" exception, nor is searching by any of those categories.

A reading of the draft orders and explanatory memoranda submitted on this particular issue indicates that some parties may have confused the Court's ruling in regard to the "White" and "Yellow Pages" directories with that on introductory information content as a gateway component. For example, U S West argues that electronic White Pages services should not be artificially restricted because "[a] purely alpha-

---

**49.** *See, e.g.,* Pacific Telesis Memorandum at 19; Bell Atlantic Memorandum at 18; BellSouth Memorandum at 18.

**50.** BellSouth Memorandum at 18.

**51.** Bell Atlantic Reply at 10. These bizarre interpretations of the scope of "White Pages" directories are yet another example of how the Regional Companies, or some of them, would

abuse any flexibility that might be afforded to them.

**52.** By the same token, the Court hereby denies requests by competitors of the Regional Companies for a reexamination of its decision to allow Regional Companies to provide "White Pages" electronic directories. *See, e.g.,* Digital Directory Assistance, Inc., Memorandum at 3.

betical listing would not attract users to the gateway and would not serve to familiarize users with the use of information services."[53] Familiarization with information services is not the purpose of White Pages; that purpose is effected by gateway introductory information. The two types of services are completely unrelated in function and design: to be listed in electronic "White Pages" directories an individual or a business needs. no more than a telephone number; by contrast, gateway introductory information serves as a guide only to those individuals and businesses who are information services providers accessible through the gateway.

The Court has endorsed the provision of welcoming pages and provider listings in the gateway context. Opinion, 673 F.Supp. at 594–95. In the Regional Companies' role as the providers of gateways to information services, they may list names, addresses, service and business categories, and other information which would assist the user in identifying a service provider, as long as such information is not offered in a way so as to discriminate among providers. The gateway should allow the customer without much difficulty to search the data base in any of these categories. This service does not, however, extend beyond the group of entities that provides services through the gateway; those who merely have a telephone and a telephone number are not in that category.

To the extent that use of the gateway can be made user friendly, the Regional Companies should be encouraged to assist novice and veteran users alike. Therefore, in addition to those items previously identified as appropriate introductory information content, the Regional Companies may provide a "help" capability and directions for navigating within their gateway. Information as to how to locate different providers, how to use the listing of provid-

ers, how to select an information service, how to exit the network, and the like would be appropriate subjects of a gateway "help" function.[54] Once again, however, this capability will be limited to information about using the gateway—it will not extend to information about an individual service provider's own system.[55] The information service provider may of course make such assistance to navigation available to its subscribers as part of its menu, but that would be a function under its control, not that of the Regional Company.

### C. *Kiosk and Revenue Sharing*

■ The Court has previously indicated that any type of consolidated billing system will be permitted as long as it does not provide for the sharing of revenue. Opinion, 673 F.Supp. at 594. Because the "kiosk" billing system used by the French Teletel, in which the telephone company bills the consumer on a flat-rate-per-service basis, appeared to be a form of revenue sharing, the Court indicated that it would preclude the Regional Companies from adopting a similar system. Opinion, 673 F.Supp. at 594 n. 310. Subsequent to that determination, the Court has analyzed further the kiosk billing arrangement, and it has now become persuaded that it should rescind that categoric preclusion.

The French kiosk system appears to have been a key factor in the growth and expansion of Teletel by simplifying consumer access to and use of the network. Users pay for Teletel calls on their regular telephone bills, and the French telephone company in turn transfers a prearranged portion of the collected sums to remunerate the individual information service providers. These payments are based on traffic statistics: the more popular a service, the greater the service provider's income.[56]

Because a simple, constant price is charged for a wide variety of services, con-

---

53. U S West Reply at 7.

54. *See* National Consumers League, et al., Memorandum at 7–8.

55. As the Court has previously noted, service menus of the information providers are a matter of editorial control, closely interrelated with

information content. Opinion, 673 F.Supp. at 595. Menu service may not be provided as part of gateway introductory information.

56. "Keys of success," *Teletel Newsletter*, Special Issue No. 2, 1987, at 5.

sumers are encouraged to browse in the system. This facilitates their familiarity with the various information providers and increases the competitiveness of services offered. The French telephone company's only interest, as it relates to billing, is in collecting a flat fee for each time increment that the system is accessed by a particular consumer.[57] It is apparently largely because of the practical simplicity of the kiosk system that Teletel has become widely used in France.[58]

Technically speaking, this type of billing arrangement involves a measure of revenue sharing; as service providers' revenue increases, the telephone company's income from the network rises. However, this cooperative arrangement benefits everyone—service provider, gateway provider, and consumer alike—by lowering administrative costs and establishing a uniform billing mechanism which can easily be understood by the novice user.

There is little, if any, offsetting potential for discriminatory behavior, since the network has no incentive to prefer one provider over another. In fact, the kiosk system is in many ways comparable to billing arrangements currently used by the Regional Companies for "976" services. In that market, telephone company charges are based on a percentage of the information provider's revenue.[59] The Court has not been apprised of any negative effects this arrangement has had on competition in the industry; and the French kiosk billing system, or any other billing mechanism which

charges on a flat rate, per call, or per minute basis, would seem to fall in that same category.[60] Therefore, the Court will withdraw its prior conclusion that kiosk-type billing arrangements would necessarily involve harmful revenue sharing agreements, and it will allow the Regional Companies to bill on any basis, provided, of course, that the billing method is not discriminatory in any way.

### D. *Protocol Conversion*

Businesses and consumers in this country are already using a broad and disparate array of computer terminals with a wide variety of operating characteristics. An effective gateway, to be fully useful, should be able to communicate readily with all these terminals, and it would therefore be advantageous if it were more sophisticated than the French model (which needs to communicate only with dumb terminals).

The Court has previously ratified the use of one particular type of protocol conversion, asynchronous-to-X.25 packet signals. However, it does not follow from the fact that this is the Teletel protocol conversion mechanism, as well as the most prevalently used conversion mode today, that the Regional Companies should be restricted to this technology. Other types of protocol conversion are in effect even now, each with a particular application. For example, a gateway which provides electronic mail would have to be able to convert individual users' protocols to X.400 protocols, the international standard for electronic mail;[61] similarly, synchronous,[62] rather than as-

---

**57.** As the Teletel network has become more sophisticated, the French telephone company has refined the kiosk system. Initially, a single charging rate was in effect for all services. To boost growth in kiosk services for businesses and professional users, which may cost more to develop but often receive fewer calls than services aimed at the general public, Teletel introduced multirate kiosk charging in the summer of 1987. Accessing services in the higher billing category is thus more expensive for users, but in return, the service providers receive a larger payment for each call.

**58.** "Keys of Success," *Teletel Newsletter*, Special Issue No. 2, 1987, at 5.

**59.** Department of Justice Memorandum at 18–19.

**60.** *See, e.g.,* Department of Justice Response at 13; Ameritech Response at 13–14.

**61.** Bell Atlantic Memorandum at 15 n. 18.

**62.** Synchronous data transmission differs from asynchronous data transmission in that the transmitting and receiving devices can have character synchronization for a significant period of time. During the time that the devices are synchronized, it is possible to transfer data without marking the extremes of each character. This makes it possible to omit stop and start bits and increase transmission efficiency and speed. J. Hammond & P. O'Reilly, *Performance Analysis of Local Computer Networks* at 38 (1986).

ynchronous protocols, are widely used by hospitals and state governments in data communication.[63]

The Court has concluded that the correct approach to this question is one which allows flexibility for change and choice, and which encourages innovation. To the extent that protocol conversion methods exist or are developed other than asynchronous-to-X.25 which do not involve the manipulation of content, their use is permitted without further specific sanction from the Court.[64]

### E. *Procedural Requirements*

Many commenters argue that transmission of information services should be allowed only in tandem with tailored provisions of a procedural nature.[65] While the interests to be protected by such provisions are important, it is also true that the imposition of many new procedural requirements, willy-nilly, would seriously impair the development of a healthy and vigorous information services market. The Court is particularly reluctant to duplicate on the judicial level a vast and complex scheme of procedures where regulation exists on the federal and state regulatory commission levels having similar purposes.[66] This is not to say, however, that the objectives of the commenters, to the extent that they are substantial, cannot and should not be attained, either through the requested requirements or by alternative means.

Two issues predominate: discrimination and cross-subsidization.

The decree in its present form already sets out in general and broad terms restrictions against discriminatory behavior. Thus, section II(B) provides that "[n]o [Regional Company] shall discriminate between AT & T and its affiliates and their products and services and other persons and their products and services in the ... interconnection and use of the [Regional Company's] telecommunications service and facilities or in the charges for each element of service." *See also* § II(A). These restrictions will continue to govern the Regional Companies in their provision of information gateway services,[67] and the Court sees no reason to add yet another requirement of this nature to the safeguards already in place.

Moreover, the Federal Communications Commission is apparently establishing mechanisms to address both the discrimination issue and the issue of cross-subsidization. For example, in the Async/X.25 Proceedings and the Third Computer Inquiry, the FCC has established a number of competitive safeguards to govern the provision of enhanced information services—includ-

---

**63.** Ameritech Reply at 4.

**64.** However, it appears that the Regional Companies have requested the FCC only for authority to perform async./X.25 and async./X.75 protocol conversion services. Tynmet–McDonnell Douglas Memorandum at 11. If the FCC adopts that standard, the Regional Companies will of course not be free to exceed the limits set by that body.

**65.** Among the safeguards advocated are provisions requiring non-discriminatory disclosure of network interface changes, *see* Hayes Microcomputer Products, Inc., Reply at 12–14, provisions against cross-subsidization, *see* Consumer Federation of America Memorandum at 4–6; Computer and Business Manufacturer's Association Response at 11–12, equal access, *see* Information Industry Association Memorandum at 13–17; ADAPSO Memorandum at 3–4, non-discrimination safeguards, *see* Electronic Yellow Pages and Information Association Memorandum at 3, 11–13; TRINITEX Reply at 6–8, requirements regarding colocation, *see* Dun &

Bradstreet Memorandum at 12, and operation through separate subsidiaries, *see,* U S Sprint Memorandum at 18.

**66.** The Court sees no reason, at this stage of the AT & T case, to endorse a return to the detailed and complicated framework considered and rejected by the parties as a possible means of settlement in that suit. As might be inferred from the names by which those negotiations have become known, Quagmire I & II, the entire subject became a hopeless web of intricate, issue-by-issue micromanagement that was destined for failure. *See,* generally, S. Coll, *The Deal of the Century: The Breakup of AT & T,* at 252–56; 297–301.

**67.** In the Order appended hereto, the decree will be amended to except from the prohibition of section II(D)(1) Regional Company provision of certain "transmission" functions as they relate to information services. Concurrently, the amendment makes clear that the Regional Companies' non-discrimination obligations are to continue in the face of that relaxation.

ing protocol conversion—by the Regional Companies.[68] The efficacy of these safeguards is of course still uncertain. *See* Opinion, 673 F.Supp. at 576. The Court retains jurisdiction over this question, however, and if it appears that the Regional Companies are abusing the authority granted herein, and that FCC regulatory control is insufficient to curb violations, the Court will take the requisite enforcement action.

Today's ruling will allow the Regional Companies to strike out into new and uncharted waters. In an effort to grant sufficient flexibility to build a workable network, the Court has resisted tying the companies' entry into the field to a host of strict new procedural requirements. That approach may increase the potential for unfair practices; certainly it places initial responsibility for complying with the decree in the hands of the Regional Companies themselves.

In the exercise of the Court's continuing jurisdiction over the decree, however, as well as pursuant to the Department of Justice enforcement authority, Regional Company behavior in the information services field will be closely monitored. Should it become apparent that the flexibility granted herein is being abused, that local bottlenecks are being used to discriminate against competitors in the information services market, or that the information ser-

vices are being subsidized by funds contributed by the ratepayers, the Court will take appropriate enforcement action. In fact, if the behavior of a particular Regional Company proves particularly egregious, the Court will not hesitate to rescind that violator's authority to engage in information transmission services altogether.[69]

## VII

### *Voice Storage and Retrieval*

Although not discussed in substance in the September 10, 1987 Opinion, Regional Company participation in the voice storage and retrieval market generated substantial debate in the most recent round of comments.[70]

The positions taken on this issue, as on many others, are in diametric opposition to each other. A number of parties, including both the Regional Companies and others[71] see no barrier to entry into this market, arguing that no manipulation of content is involved in the service.[72] Other parties and intervenors postulate that, due to the Regional Company monopoly of the local switching services, a competitive market for the delivery of these services to consumers is likely to develop only if the Regional Companies remain prohibited[73] from providing them.[74] Yet other parties sup-

---

**68.** Async/X.25 Order, 100 F.C.C.2d at 1104–12; *Computer III Phase II Order*, 2 FCCRcd. at 3078–82. *The fundamental precepts underlying the safeguards adopted by the FCC are that:* (1) transparent transmission services should continue to be available to the public; (2) the Regional Companies should not be allowed to discriminate against competing information service vendors or their customers; and (3) the Regional Companies' monopoly ratepayers should not bear the costs of these competitive services.

**69.** The announcement of the possible use of this sanction, while severe, is intended to place the Regional Companies on notice that the Court expects their complete fidelity to the decree in entering this new market.

**70.** Since the Court did not discuss this topic in its September 10, 1987 Opinion, somewhat greater elaboration is necessary here than with respect to the "transmission" discussion, *supra.*

**71.** *E.g.,* National Consumers League Memorandum at 14–15; Voice Message Desk Systems, Inc., Memorandum at 2–6; MessagePhone, Inc.,

Memorandum at 3–11; Florida Public Service Commission Memorandum at 11–12; Michigan Public Service Commission Memorandum at 4.

**72.** *E.g.,* NYNEX Memorandum at 8–9; Ameritech Memorandum at 7–10; BellSouth Reply at 8.

**73.** The decree prohibits the Regional Companies, *inter alia,* from "storing" and "retrieving" information. Sections II(D)(1), IV(J). Of course, like all restrictions, they are subject to removal pursuant to section VIII(C).

**74.** Enhanced Service Providers Memorandum at 4–5; MCI Memorandum at 2; Compuserve Memorandum at 8; Consumer Federation of America Memorandum at 3. It is also argued that the Regional Companies would possess "substantial potential" to subsidize these services illegally and to discriminate in providing competitors access to essential facilities. CompuServe Memorandum at 9–10; Committee of Corporate Telecommunications Users Response at 8.

port Regional Company provision of certain storage and messaging capabilities, but only if limitations are clearly defined by the Court.[75]

There are three quite distinct settings in which storage capabilities of the Regional Companies could be used in the information services market.

First, and most basic, is very short term storage. This transient storage and retrieval of information is an integral part of the transmission of communications and is currently being performed within the network in a variety of ways. Data is routinely stored each time a telephone call is made; the network stores the digits dialed by the calling party until a sufficient number of digits are input to allow direction of the call to its destination.[76] In the context of speed calling and call forwarding, storage of user-identified numbers occurs over time, not merely during the course of the transmission of a telephone call. Even the basic packet switching function, performed on an intra-LATA basis by Regional Companies, involves the breakdown of data or voice communications into small bits of information that are then collected and transmitted between nodes. These bits of data are subject to constant storage, error checking, and retransmission, as required for accurate transmission.

The information services gateway as contemplated by the September 10, 1987 Opinion will also necessarily require some stor-age capability to house the welcoming message, the Information Service Provider (ISP) directory, and information for the provision of billing services. At least at this elementary level, the Regional Companies must plainly be and will be permitted to engage in storage and retrieval functions.[77]

Second, the Regional Companies might provide storage space in their gateways for databases created by others and lease that space to information service providers and end users. Making storage facilities available at the gateway level will make communication more efficient by moving information closer to the end user, thereby reducing transmission costs.[78] It is also possible that gateway storage would reduce entry costs to the information providers by obviating the need for their purchase of their own storage hardware.[79]

This use of storage capabilities, while not technically necessary to an information infrastructure, would substantially assist in attracting to the system providers of information services, and it consequently would help to ensure that a "critical mass" of services would be available through the network. There is no significant potential for discriminatory behavior in this market, and this use of storage capabilities will also be permitted.

The third, and most encompassing use of storage capabilities would be in the provi-

---

75. *E.g.,* Information Industry Association Response at 4–11; Committee of Corporate Telecommunications Users Response at 7–9. One draft order, submitted jointly by U S West and the ANPA, proposes that the Regional Companies be permitted to provide storage on a wholesale basis to information providers, but prohibited from such provision on a retail basis to end users. U S West Memorandum at 14–16; ANPA Memorandum at 15. The Court rejects this distinction as being too difficult to administer in practice without the endless submission of requests for construction.

76. Southwestern Bell Memorandum at 9.

77. There is little dispute as to the desirability of allowing the Regional Companies to engage in storage to this limited extent. *See, e.g.,* Consumer Federation of America Reply at 5, "The only storage and messaging functions in which the Regional Companies should engage are those internal network functions which are fundamental to prompt, high-quality interconnection between ISPs and end-users."

78. Ameritech Memorandum at 8; Bell Atlantic Memorandum at 8.

79. *See* Ameritech Memorandum at 9; Bell Atlantic Memorandum at 8. It may be true that some information providers would choose to obtain storage capabilities from the Regional Companies should that service be available through the gateway. However, this service, like many others relating to computer technology, is also available through independent providers, and it is therefore neither necessary that the gateway furnish this facility, nor will the gateway necessarily provide the most cost efficient storage.

sion of services such as voice messaging,[80] voice storage and retrieval (VSR),[81] and electronic mail.[82] Provision of these services would not involve the Regional Company in the generation or manipulation of information content[83] for provision to the public.[84]

Although there is some dispute on this issue, the Court is persuaded that voice information services are likely to become much more affordable and much more widely used in this country[85] if the Regional Companies were permitted to provide storage to accommodate messages and other information until the intended recipient was ready to receive the transmission.[86]

Objections to a wholesale Regional Company entry into markets requiring storage capabilities fall generally into two categories: first, that these are not functions "necessary" to a gateway, and for that reason were not contemplated by the Sep-

tember 10, 1987 Opinion; and second, that there has been no showing under section VIII(C) of the decree as to lack of competitive harm.

To the extent that objections to Regional Company entry into this market depend on a finding that storage is not a function "necessary" to the provision of transmission services, the argument succeeds in part and fails in part. As indicated *supra,* some amount of storage is necessary to any transmission activity over the local exchange network, be it in the context of information services or in routine telephone communication. These types of storage functions are therefore "necessary" to the gateway infrastructure in the narrowest sense of the word. It is, however, debatable whether the broader and more sophisticated storage functions briefly described above are necessary to transmission. Although the Regional Companies could transmit information without having the

---

**80.** The term "voice messaging" encompasses a wide assortment of caller-directed, transient storage, limited-duration exchange telecommunications services.

The technology allows a caller, in response to a busy signal or no answer, to record a brief message and then provide the calling instrument, the originating PBX, or the local exchange central office with routing instructions and a limited duration during which the system will attempt to complete the call and let the called party accept the recorded message at his discretion. In the event of an interexchange call, the originating caller rather than the local carrier selects the interexchange carrier. Because the caller must identify himself, the called party can accept the message or merely hang up; by agreeing to receive the message the called party becomes liable for the cost of the service. MessagePhone Memorandum at 3–4.

Voice messaging is thus a purely unidirectional transmission. It is strictly caller-directed and can be initiated with as little as a single digit or character code. There is little to differentiate voice messaging from a standard telephone call other than by the incorporation of a short time delay for message delivery.

**81.** Voice storage and retrieval systems, in generic terms, act as sophisticated versions of an answering machine. Typically, incoming calls are intercepted by equipment which acquires analog speech, converts it to digital forms, and stores the digital version until it is required for retrieval in analog form. Huber Report at 10.1.

**82.** VSR and electronic mail services are much alike, except in the form of the information

content: in VSR, the information is stored as a voice message, in electronic mail services, it is stored as a printed message.

**83.** In the simplest sense, such use of storage capability allows for time-delay services, that is, messages from an information provider or a user are stored until the particular telephone line is available or the called person or machine becomes free.

**84.** The fact that content might be converted to digital form for storage, and then returned to analog form for retrieval and transmission to the called party does not place it within the realm of content manipulation. For practical purposes, the stored information reaches the intended recipient in the same content form as it was in when it was delivered.

**85.** The experience of foreign telephone companies shows that these services are an important gateway function. Although the French Teletel system does not provide electronic mail now, it is installing that capability. In Japan, Canada, West Germany, Ireland, Denmark, Belgium, and Holland, the telephone companies all provide this service. Bell Atlantic Memorandum at 11. Voice messaging has become so popular in Japan that consumers send 60,000 voice messages each day. *See* Communications Week, September 28, 1987, at 56; *How Tokyo Is Turning Telephones Into Answering Machines,* Business Week, February 16, 1987 at 104C.

**86.** *See, e.g.,* OCTEL Memorandum at 12.

ability to perform these functions, the functions are certainly helpful to transmission.[87]

In any event, however, whether or not the provision of such services is necessary to the performance of the functions of a transmission gateway, the Court may remove the restriction if it concludes that the section VIII(C) test has been met. In this regard, the opponents of Regional Company entry into the voice storage and retrieval markets contend that such entry would result in the displacement of independent firms.[88]

It may safely be assumed that a large potential market exists for voice storage and retrieval services, far beyond the relatively meager market that is serviced by the existing providers. Entry of the Regional Companies into this market would be bound to enlarge it manifold, and new economic opportunities would be created for many new providers as well as for those who now supply the market. What has until now been a relatively quiescent market is likely to become a broad, vigorous, and competitive one. On the other hand, it may well be that the Regional Companies, not satisfied with the market share they are likely to acquire, would attempt also to drive out, or reduce the opportunities for, those who independently service that market, either as voice storage providers or as manufacturers or sellers of answering machines.

The issue as to the potential for anticompetitive activity is thus a close one; valid arguments can be made to support either outcome, and the Court is not convinced that a showing has been made to militate in either direction.

In the Court's opinion, several factors tip the balance in favor of Regional Company entry.

First. In view of the fact that the core violations that were the subject of proof during the AT & T trial did not involve this market at all, there is less reason to believe that Regional Company involvement in this industry will lead to anticompetitive behavior than would, for example, its involvement in long distance, provision of information content, or manufacture of telecommunications products.

Second. Due to the subtle competitive pressure exerted on this market by the presence of service bureaus, answering services, and particularly home answering machines, the ability to control prices and otherwise to operate monopolistically will be substantially diluted.

Answering machines are used by about ten percent of American households.[89] The consumer's choice between answering machines and Regional Company sponsored voice storage and retrieval will most likely be cost-sensitive—should the price of automated services greatly exceed the amortized cost of an answering machine, few individuals are apt to subscribe. This economic impetus will, to a large extent, remove the ability of Regional Companies to raise prices unreasonably.

Third. In view of the largely inconclusive and speculative nature of the competitive considerations, other public policy

---

87. In one sense, call answering, voice mail, and electronic mail offerings are independent services for which competitive markets currently exist. *See, e.g.,* MCI Memorandum at 3. In this view, the question simply is whether Regional Company entry into these markets would have positive or negative competitive effects.

88. It is of course a fundamental principle of jurisprudence that the antitrust laws protect competition, not competitors. *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962). These laws seek to foster competition by increasing the number of providers in the marketplace and thereby allowing the consumer, through demand for services, to select the winning firm. It is likewise the purpose of the decree to allow consumers to reap the benefits of competition in telecommunications. The Regional Companies should not be excluded from this market simply because, due to their size and interest in the communications field, they would likely be formidable competitors therein. To decide otherwise would be in effect to grant exclusive franchises to the current providers. *See also* note 48, *supra.*

89. Voice Message Desk Systems, Inc., Memorandum at 5.

factors should also be considered.[90] In this context, the public interest heavily tips the balance in favor of the requests of the Regional Companies.

The likelihood is that truly ubiquitous access to theseservices will not be had by the residential and small business consumer in the absence of Regional Company involvement.[91] Despite the emergence of several independent providers, the market for voice storage services, particularly for the occasional user, has not developed in this country to anywhere near its potential. As a practical matter, small and medium-sized businesses as well as consumers have to date had very limited opportunity to enjoy the benefits of these services, for reasons very much like those that explain the limited development of videotex itself in the United States. *See* Opinion, 673 F.Supp. at 590–91.

In-house voice information systems require large up-front investments that are cost-effective only when spread over a large number of users, and only large businesses are therefore willing to make this capital investment. Further, high start-up and operating costs have limited the emergence of individual service providers, and where such providers do exist, economic factors have generally required them to deploy large, centralized facilities that, in order to serve broad areas, depend upon expensive long-haul transmission capabilities. To minimize their transmission costs, existing providers of voice information services have, once again, focused their business on service to larger business users, especially those located near the provider's own facility.[92] More generally, consumer and small business awareness has been low, and the need for presubscription has kept potential users from joining the system.

Given these conditions and limitations, it is appropriate for the Court to take into account values in addition to those stemming exclusively from an environment free of anticompetitive activity. In this case, such values revolve largely around the interest of providers and potential consumers to attain the widest possible availability of voice storage and retrieval services to all segments of American society. As indicated, this objective can most readily be achieved by allowing Regional Company participation in the market for voice storage and retrieval type services. On this basis, and since the risk of anticompetitive activity is small, the Court will allow such participation. The Regional Companies will accordingly be authorized to enter the markets for voice storage and retrieval, voice messaging, and electronic mail.[93]

**90.** As indicated above (p. 5 n. 11, *supra*), this is not the first time that the Court has weighed matters of public import in ruling on questions of interpretation under the decree. The earliest such consideration occurred when the decree itself was modified and approved six years ago, in part because of public policy considerations which extended beyond the category of antitrust violations. At that time, the Court noted that the interests of universal service, for example, strongly supported entry of the decree, as well as the adoption of changes that allowed the Regional Companies to market customer premises equipment and Yellow Pages directories. The most recent such consideration occurred only last month, when the Court approved waivers of the terms of the decree, the public interest in receiving a particular service being at issue. *See, e.g., United States v. Western Electric Co.,* C.A. No. 82–0192, slip op., 1988 WL 72635 (D.D.C. Feb. 8, 1988) (time and weather information).

**91.** *See, e.g.,* National Consumers League Memorandum at 14–15; MessagePhone Memorandum at 5; Voice Message Desk Systems, Inc., Memorandum at 3–6. This conclusion is disputed by AMVOX, a recently formed provider of telephone answering and voice messaging, which claims to have targeted the small business and residential customer as its prime service audience. AMVOX Memoranda at 4. This news is encouraging, and it is to be hoped that this trend will continue. However, the fact that this independent company has entered the market and seeks to reach all small business and residential customers is of course not a guarantee that this objective will be met.

**92.** OCTEL Memorandum at 3–4.

**93.** This ruling in no way exempts the Regional Companies from complying with the more general ban against engaging in information services activities which involve the manipulation or generation of content.

## VIII

### Order

For the reasons and on the bases described above, it is this 7th day of March, 1988

ORDERED that the decree entered herein on August 24, 1982, be and it is hereby amended by the addition of the following new subsection of section VIII:

K. Notwithstanding the provisions of section IV(J):

1. The separated BOCs shall be permitted to engage in the transmission of information as part of a gateway to an information service, but not in the generation or manipulation of the content of information. "Transmission" shall mean the performance of the following functions: data transmission, address translation, protocol conversion, billing management, and introductory information content.

2. The separated BOCs shall be permitted to engage in voice storage and retrieval services, including voice messaging and electronic mail services.

3. In the performance of the services authorized herein, no BOC shall discriminate between and among providers of information or against other providers of information services or of voice storage and retrieval services.